2022-1475

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

---

TIMOTHY MOORE,
*Plaintiff-Appellant*

v.

UNITED STATES,
*Defendant-Appellee*

---

On Appeal from the Court of Federal Claims
The Honorable Charles F. Lettow, Senior Judge
No. 1:21-cv-01931-CFL

---

# APPELLANT'S PRINCIPAL BRIEF AND APPENDIX

---

Peter Broida
Suite 203
1840 Wilson Blvd.
Arlington VA 22201
Telephone: 703-841-1112
Facsimile: 703-841-1006
peterbroida@gmail.com

Attorney for Timothy Moore

April 8, 2022

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1475

**Short Case Caption** Moore v. US

**Filing Party/Entity** Plaintiff-Appellant

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box.** Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/08/2022

Signature: /s/ Peter Broida

Name: Peter Broida

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Timothy Moore | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS

I. STATEMENT OF RELATED CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

IV. STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A. Moore Sued in the Claims Court, Asserting a Pay Disparity Between Him and Female Comparators that Violated the Equal Pay Act . . . . 2

B. Defendant Moved to Dismiss Moore's Complaint for Failure to Make a *Prima Facie* Allegation of Historical or Current Sex-based Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

C. The Court of Federal Claims Dismissed Moore's Complaint for Failure to State an EPA Claim Through Reliance on this Court's Decisions in *Yant v. United States* and *Gordon v. United States* . . . . . . . . . . . . . . 5

V. SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

VI. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

A. Plaintiff Need Only Plead a Disparity, Not Past or Present Sex Discrimination, to Avoid Dismissal of His Complaint . . . . . . . . . . . 9

B. *Yant* Does Not Inject an Element of Motivational or Historical Analysis into a Comparator-to-Comparator EPA *Prima Facie* Case . . . . . . . 16

C. The *Gordon* Decision Was Vacated and Does Not Require Application of *Yant* to a Basic EPA Comparator Case . . . . . . . . . . . . . . . . . . . . 26

VII. CONCLUSION AND RELIEF SOUGHT . . . . . . . . . . . . . . . . . . . . . . . . . 40

APPENDIX

## TABLE OF AUTHORITIES

### CASES

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974) .................... 40

*Alvarado v. Board of Trustees of Montgomery Community College*, 848 F.2d 457 (4th Cir. 1988) .................................... 36

*Beck-Wilson v. Principi*, 441 F.3d 353 (6th Cir. 2006) ..................... 25

*Boaz v. FedEx Customer Information Services, Inc.*, 725 F.3d 603 (6th Cir. 2013) ................................................ 40

*Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697 (1945) ..................... 40

*Corning Glass Works v. Brennan*, 417 U.S. 188 (1974) ................ 10, 17

*County of Los Angeles v. Davis*, 440 U.S. 625 (1979) ...................... 36

*EEOC v. Md. Ins. Admin.*, 879 F.3d 114 (4th Cir. 2018) ..................... 24

*EEOC v. State of Del. Dept. of Health and Social Services*, 865 F.2d 1408 (3rd Cir. 1989) ................................................ 24

*Fallon v. State of Ill.*, 882 F.2d 1206 (7th Cir. 1989) ........................ 25

*Goodrich v. IBEW,* 815 F.2d 1519 (D.C. Cir. 1987) ........................ 24

*Gordon v. United States*, 903 F.3d 1248 (Fed. Cir. 2018), *vacated*, 754 Fed. Appx. 1007 (Fed. Cir. 2019) .................. 26-36

*Gould, Inc. v. U.S.*, 935 F.2d 1271 (Fed. Cir. 1991) .......................... 8

*Kaplan v. United States,* 727 Fed.Appx. 1011 (Fed. Cir. 2018) (NP) ......... 16

*Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618 (2007) ........ 23

*Maxwell v. City of Tucson*, 803 F.2d 444 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . 25

*Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304 (10th Cir. 2006) . . . . . . . . 25

*Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518 (11th Cir. 1992) . . . . . . . . 25

*Molden v. U.S.*, 11 Cl. Ct. 604 (1987) . . . . . . . . 22

*United States v. Munsingwear*, 340 U.S. 36 (1950) . . . . . . . . 36

*Peters v. City of Shreveport*, 818 F.2d 1148 (5th Cir.1987) . . . . . . . . 24

*Ryduchowski v. Port Auth. NY and NJ*, 203 F.3d 135 (2nd Cir. 1999) . . . . . . . . 24

*Stearn v. Dept. of Navy*, 280 F.3d 1376 (Fed. Cir. 2002) . . . . . . . . 15

*Strecker v. Grand Forks County Social Service Bd.*, 640 F.2d 96 (8th Cir. 1981) . . . . . . . . 25

*Winkes v. Brown University*, 747 F.2d 792 (1st Cir. 1984) . . . . . . . . 24

*Wolfe v. McDonough*, ___F.4th___ (Fed. Cir. 2022) . . . . . . . . 37

*Yant v. United States*, 588 F.3d 1369 (Fed. Cir. 2009), *cert. den.*, 562 U.S. 827 (2010). . . . . . . . 16, 18-22

## STATUTES, REGULATIONS

29 USC 206(d) . . . . . . . . 9
29 CFR 800.141 . . . . . . . . 12
29 CFR 1620.27 . . . . . . . . 15

**OTHER AUTHORITIES**

Deyling, Robert P., *Dangerous Precedent: Federal Government Attempts to Vacate Judicial Decisions upon Settlement*, 27 J. Marshall L. Rev. 689 (1994) . . . . . . . 36

EEOC Compliance Manual on "Compensation Discrimination" (Directive 915.003 [12/5/2000]) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

James, Juliene, *The Equal Pay Act in the Courts: A De Facto White-collar Exemption*, 79 NYU L. Rev. 1873 (2004) . . . . . 11

Savage, Mariah, *Money Talks: Using Prior Salary as an Affirmative Defense in Equal Pay Claims*, 2020 Utah L. Rev. 289, No. 1, Article 5 . . . . . . . . . 38

*Employment Discrimination Law,* Lindemann, *et al.*, (ABA 2020) . . . . . . . . 17-18

## I. STATEMENT OF RELATED CASES

There are no related cases.

## II. JURISDICTIONAL STATEMENT

Plaintiff's suit in the Court of Federal Claims was brought by an Timothy Moore, an employee of the Securities and Exchange Commission, who asserted that he was and is paid less than female comparators. The lower court's jurisdiction over Plaintiff's Equal Pay Act claim is based on the Tucker Act, the Equal Pay Act, 29 USC 206(d), and the Back Pay Act, 5 USC 5596. This appeal is from the January 27, 2022, final order of the Claims Court that disposed of the parties' claims by dismissing Plaintiff's complaint. The notice of appeal was filed on February 14, 2022. The basis for this Court's jurisdiction is 28 USC 1295(a)(3).

## III. STATEMENT OF THE ISSUES

The issue is whether an Equal Pay Act complaint is sufficient to avoid dismissal if the plaintiff nonfrivously alleges he is paid less than a female comparator employee performing the same or similar work, requiring the same skill and experience, under the same working conditions, leaving the defendant to establish, and plaintiff to rebut, an affirmative defense under 29 USC 206(d) that the differential is for reasons other

than sex.

## IV. STATEMENT OF THE CASE

### A. MOORE SUED IN THE CLAIMS COURT, ASSERTING A PAY DISPARITY BETWEEN HIM AND FEMALE COMPARATORS THAT VIOLATED THE EQUAL PAY ACT

Timothy Moore filed an Equal Pay Act suit in the Court of Federal Claims on September 30, 2021, alleging that his present and past pay at the SEC, his employer, is and was less than that of a female comparator. Appx57 The Government moved to dismiss the complaint for failure to state a claim. The Claims Court granted that motion on January 27, 2022, with the Opinion and Judgment leading to this appeal. That Court's decision is reported at *Moore v. US*, 157 Fed. Cl. 747 (2022). Appx1

Moores's EPA complaint arose from his employment as an SEC examination manager in Washington. The facts are taken from the complaint, Appx57, as that complaint was developed through material provided in opposition to the dismissal motion.

Moore complains of lower pay than that of two female examination managers doing the same work, requiring the same skills, performed under the same working conditions. Moore's SEC work began in March 2008. The comparators are two exam managers, Katherine Monahan and Christine Curley. Provided to the Claims Court were functional descriptions of the work of Moore, Appx22, and the comparators,

Monahan, Appx33, and Curley, Appx44.

Plaintiff asserted in his complaint that by agreement with labor union NTEU, in 2014 SEC instituted what was called a pay transition program allowing employees (although the union contract covered the bargaining unit, the negotiated benefits were extended to many management personnel, to include examination managers) to seek salary readjustments based on their years of employment and specialized work experience. To be considered for pay transition, SEC asked employees to submit an application expressing their interest and providing a resume that included their work history, job titles, duties, dates of employment, and full or part-time work status. An open period for applications was set from approximately September 14 to October 14, 2014. Appx58-59. The application process is briefly described in a September 22, 2014, SEC "Pay Transition Update." Appx9. The background, operation, and financing of the SEC's pay transition program are more fully summarized in a 2016 SEC Inspector General report. Appx11-21.

Comparators Monahan and Curley timely applied for pay transition. Mr. Moore did not, because he was preoccupied with some family-related issues. Complaint ¶8. Appx59.

Through the transition process, in June of 2015, Ms. Curley's salary was raised from $175,534 to $195,438; it has since advanced to about $236,000. Ms.

Monahan's salary was raised from $144,291 to $169,269; it has since increased to about $212,000. The salary progressions are described in Moore's Complaint, Appx59-60, and in the decision of the Claims Court, Appx2.

After Moore's family problems abated, but well after the open period for the pay transition program closed, Moore learned of the comparators' higher pay. In September 2016, Moore requested of SEC's personnel officer and his managers that he receive consideration for pay transition. The personnel director told Moore to consider using the SEC's internal grievance procedure or to file a complaint through the EEO process. Appx61. Moore tried the EEO process, without success, and he redirected his efforts to the Claims Court through his Equal Pay Act complaint. As to the pay transition process, Moore asserted that there was no financial basis for denying his belated application for transition, and that the SEC had in its employment records all the information it needed to evaluate Moore's proper salary level without necessity for his application.

The effect of Moore's failure to apply within the window set by SEC for pay transition, the existence of funding for an increase in Moore's salary, and the practical necessity for a resume for SEC to assess Moore's qualifications for a pay increase are not before this Court, although those issues may surface on any remand if they are timely raised by the Government as affirmative defenses. At issue here is only

whether Moore's complaint of an EPA violation was sufficient to survive a motion to dismiss for failure to state a claim.

## B. DEFENDANT MOVED TO DISMISS MOORE'S COMPLAINT FOR FAILURE TO MAKE A PRIMA FACIE ALLEGATION OF HISTORICAL OR CURRENT SEX-BASED DISCRIMINATION

In its motion to dismiss, the Government successful argument was that Moore failed to plead a *prima facie* case under the Equal Pay Act.

The Government's motion did not deny the existence of comparators, disparate payment, or similarity of work. The Government asserted that Moore did not allege that SEC raised the pay of the comparators because of their sex. The Government's motion did assert that Moore did not meet the deadline set for participation in the transition program, but that was not a basis for the disposition of the complaint by the Claims Court.

The Government asserted, and Moore agreed in his response to the motion to dismiss, that the proper limitation period for Moore's claim was not the six-year period of the Back Pay Act, but was the two or three year limitation period set by the Fair Labor Standards Act, of which the EPA is an amendment.

## C. THE COURT OF FEDERAL CLAIMS DISMISSED MOORE'S COMPLAINT FOR FAILURE TO STATE AN EPA CLAIM THROUGH RELIANCE ON THIS COURT'S DECISIONS IN *YANT V. UNITED STATES* AND *GORDON V. UNITED STATES*

The Claims Court dismissed the complaint for failure to state a *prima facie* EPA case, concluding that Moore's complaint, based on a couple comparators, required a preliminary showing—not just of a pay disparity—but by pleading that the disparity was caused by sex discrimination, *Moore v. US*, 157 Fed. Cl. 747, 749-50 (2022), Appx3-4:

> In essence, "[t]o establish a *prima facie* case under the Equal Pay Act, a plaintiff must establish that he or she received a lower wage for performing 'equal work requiring equal skill, effort, and responsibility' to that carried out by a comparator of the opposite sex under similar working conditions." *Jordan v. United States*, 122 Fed. Cl. 230, 241 (2015) (alterations omitted) (quoting *Coming Glass Works v. Brennan*, 417 U.S. 188,195 (1974) (additional citations omitted)). The Court of Appeals for the Federal Circuit has explained that, as concerns Equal Pay Act allegations, it is Mr. Moore's burden to "show[] that discrimination based on sex exists or at one time existed." *Yant v. United States*, 588 F.3d 1369,1373 (Fed. Cir. 2009).[3] In short, to survive dismissal, Mr. Moore's complaint must make more than speculative and conclusory averments that the difference in pay between himself and the two named, female comparators is the result of "pastor present discrimination based on sex." *Id.* at 1374.
>
> > [3] Mr. Moore contends that a showing of sex discrimination is not required to make a *prima facie* case under 29 U.S.C. § 206(d)(1). Pl.'s Opp'n at 7-8. However, plaintiff relies on decisions from this court that predate the Federal Circuit's decision in *Yant. Id.* (citing *Cooke v. United States*, 85 Fed. Cl. 325, 341 (2008) (additional citations omitted)). Decisions within the Federal Circuit's purview that issued after *Yant* recognize the sex discrimination element of a *prima facie* case. *See Gordon v. United States*, 903 F.3d 1248,1252 (Fed. Cir. 2018), *vacated on other grounds*, 754 Fed. Appx. 1007 (Fed. Cir. 2019). Mr. Moore's opposition even cites one such case. *Id.* at 8 (citing *Kaplan v. United States*, 126 Fed. Cl. 72, 82 (2016) ("[F]or plaintiff to establish a prima facie violation, therefore, she must show that [the government]

> discriminated on the basis of sex.")). Mr. Moore further attempts to convince the court that academic commentary, factual differences between his case and the facts in *Yant*, and his own interpretation of the statute make the Federal Circuit's interpretation of 29 U.S.C. § 206(d)(1) inapplicable to the present circumstances. *See* PL's Opp'n at 15-19. However, the court may not ignore binding authority from the Federal Circuit. *See Coltec Indus., Inc. v. United States*, 454 F.3d 1340,1353 (Fed. Cir. 2006) ("There can be no question that the Court of Federal Claims is required to follow the precedent of the Supreme Court, our court [the Federal Circuit], and our predecessor court, the Court of Claims.").

Mr. Moore's complaint sets out the factual contention that he receives a lower wage than the two named, female comparators. The two named women make, respectively, $236,000 and $212,000, while plaintiff makes $195,000. See Compl. ¶¶ 9-12. Mr. Moore's complaint also alleges that plaintiff and the two female comparators are "Examination Managers" at the SEC's SK-15 pay level and perform the same work of managing examinations of regulated entities under the same procedures, Compl. ¶¶ 2-3,11, which suffices at the 12(b)(6) stage to show that they perform "equal work requiring equal skill, effort, and responsibility," *Jordan* 122 Fed. Cl. at 241 (alterations and quotations omitted). Even so, plaintiffs complaint does not claim that the difference in pay for equal work is the result of "past or present discrimination based on sex." *Yant*, 588 F.3d at 1374. Rather, it delineates a salary adjustment process, resulting in Mr. Moore's lower salary, that was devoid of any sex-based discrimination. The adjustment program "applied to all SEC staff," Compl. ¶ 5, the two female "comparators applied for pay transition consideration within the open period," Compl. ¶ 7, and Mr. Moore "did not apply for pay transition during the open period," Compl. ¶ 8.

Because the complaint affirmatively acknowledges that no sex-based discrimination caused the difference in pay between Mr. Moore and the two named female comparators, plaintiff does not state a prima facie violation of 29 U.S.C. § 206(d)(1). *See, e.g., Spellers v. United States*,____Fed. Cl.______, 2021 WL 5630801 (Dec. 1, 2021). The court therefore holds that plaintiff has not "state[d] a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (internal quotations omitted).[4]

> [4] The salient events occurred in 2014, seven years ago, and were sought to be reopened by Mr. Moore in 2016, five years ago. The statute of limitations for claims under the Equal Pay Act is two years, extended to three for willful violations. *See* 29 U.S.C. § 255(a). The parties secondarily argue whether Mr. Moore's claim is too late, but the court finds it unnecessary to reach that aspect of the case for decision.

## V. SUMMARY OF ARGUMENT

The Equal Pay Act sets a two-step order of proof for the parties to a comparator-to-comparator case. Plaintiff made the nonfrivolous allegation that his pay was and is less than an individual of the other gender whose skills, duties, and working conditions are the same or similar. That is step one: a nonfrivolous pleading of a disparity. At step two, the employer is left to establish a defense through the four means outlined by the EPA, subject to rebuttal by the plaintiff. The Court of Federal Claims erred by dismissing Moore's complaint for failure to plead a *prima facie* case. The decisions relied on that Court, *Yant v. United States* and *Gordon v. United States*, either do not apply to the type of case brought by Moore or lack precedential effect.

## VI. ARGUMENT

### STANDARD OF REVIEW

Whether the Court of Federal Claims properly dismissed an action for failure to state a claim is a question of law, reviewed *de novo* in this Court. *Gould, Inc. v. U.S.*, 935 F.2d 1271, 1273-74 (Fed. Cir. 1991).

## A. PLAINTIFF NEED ONLY PLEAD A DISPARITY, NOT PAST OR PRESENT SEX DISCRIMINATION, TO AVOID DISMISSAL OF HIS COMPLAINT

The Equal Pay Act, an FLSA amendment, defines a form of sex discrimination without requiring that the discrimination be intentional or result from disparate impact of present or past employment practices. Under 29 USC 206(d):

> *Prohibition of sex discrimination*
>
> (1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (I) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

### 1. Pleading and Shifting Burdens of Proof in the EPA Comparator Case

The discrimination in a straightforward comparator case is established when the plaintiff alleges payment of different wages to employees of the opposite sex doing the same or similar work. The employer then must respond and prove that the distinction in pay rates is, ultimately, on a factor—any factor—other than sex.

Plaintiff is then left to refute the legitimacy of the employer's explanation and proof. At the complaint stage, plaintiff need not establish the cause of the differential in payment, only that it involves another employee of a different gender.

Although it did not involve a basic comparator case, *Corning Glass Works v. Brennan*, 417 U.S. 188, 195-96 (1974), explained EPA's shifting burdens of proof:

> The Act's basic structure and operation are similarly straightforward. In order to make out a case under the Act, the Secretary must show that an employer pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." Although the Act is silent on this point, its legislative history makes plain that the Secretary has the burden of proof on this issue,' as both of the courts below recognized.[10]
>
> > [10] *Hodgson v. Corning Glass Works*, 474 F. 2d 226, 231 (CA2 1973); *Brennan v. Corning Glass Works*, 480 F. 2d 1254, 1258 (CA3 1973). *See also Hodgson v. Behrens Drug Co.*, 475 F. 2d 1041, 1049 (CA5 1973); *Hodgson v. Golden Isles Convalescent Homes, Inc.*, 468 F. 2d 1256, 1257 (CA5 1972); *Hodgson v. Fairmont Supply Co.*, 454 F. 2d 490, 493 (CA4 1972); *Hodgson v. Brookhaven General Hospital*, 436 F. 2d 719, 722 (CA5 1970); *Shultz v. American Can Co.-Dixie Products*, 424 F. 2d 356, 360 (CA8 1970).
>
> The Act also establishes four exceptions-three specific and one a general catchall provision-where different payment to employees of opposite sexes "is made pursuant to (I) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." Again, while the Act is silent on this question, its structure and history also suggest that once the Secretary has carried his burden of showing that the employer pays workers of one sex more than workers of the opposite sex for equal work, the burden shifts to the employer to show that the differential is justified under one of the Act's four exceptions. All of the many lower courts that have considered this question

have so held,[11] and this view is consistent with the general rule that the application of an exemption under the Fair Labor Standards Act is a matter of affirmative defense on which the employer has the burden of proof.[12]

> [11] *See Hodgson v. Corning Glass Works*, *supra*, at 231; *Brennan v. Corning Glass Works*, *supra*, at 1258; *Hodgson v. Robert Hall Clothes, Inc.*, 473 F. 2d 589, 597 (CA3), *cert. denied sub nom. Brenvan v. Robert Hall Clothes*, Inc., 414 U. S. 866 (1973); *Hodgson v. Security Nat. Bank of Sioux City*, 460 F. 2d 57, 59 n. 4 (CA8 1972); *Shultz v. Wheaton Glass Co.*, 421 F. 2d 259, 266 (CA3), *cert. denied*, 398 U. S. 905 (1970); *Shultz v. American Can Co.*, *supra*, at 362; *Shultz v. First Victoria Nat. Bank*, 420 F. 2d 648, 654 n. 8 (CA5 1969); *Hodgson v. Industrial Bank of Savannah*, 347 F. Supp. 63, 67 (SD Ga. 1972); *Hodgson v. Maison Miramon*, Inc., 344 F. Supp. 843, 845 (ED La. 1972); *Hodgson v. J. W. Lyles, Inc.*, 335 F. Supp. 128, 131 (Md. 1971), *aff'd*, 468 F. 2d 625 (CA4 1972); *Hodgson v. City Stores, Inc.*, 332 F. Supp. 942, 947 (MD Ala. 1971); *Shultz v. Kimberly-Clark Corp.*, 315 F. Supp. 1323, 1332 (WD Tenn. 1970); *Wirtz v. Basic Inc.*, 256 F. Supp. 786, 790 (Nev. 1966). *See also* 29 CFR § 800.141 (1973).
>
> [12] *See A. H. Phillips, Inc. v. Walling*, 324 U. S. 490, 493 (1945); *Arnold v. Ben Kanowsky*, Inc., 361 U. S. 388, 392 (1960); *Walling v. General Industries Co.*, 330 U. S. 545, 547-548 (1947); *Mitchell v. Kentucky Finance Co.*, 359 U. S. 290, 295 (1959).

The analysis of *Corning Glass* was explained, James, Juliene, *The Equal Pay Act in the Courts: A De Facto White-collar Exemption*, 79 NYU L. Rev. 1873, 1883-84 (2004):

> The Supreme Court provided its first, and only, interpretation of the Act in *Corning Glass Works v. Brennan*. In that case, though the Court did not require a plaintiff making an EPA claim to prove intent, the Court adopted a burden-shifting analysis analogous to the McDonnell Douglas scheme employed in Title VII cases.[57] In the first stage of the scheme which is the only stage with which this Note is concerned, a plaintiff must come forward

with evidence that supports her claim. For a plaintiff to make out her *prima facie* case, she must prove first that she is performing work that is "equal" to or "substantially equal" to that of a male comparator in the same establishment. The factors considered in determining whether the work is "equal" or "substantially equal" are skill, effort, responsibility, and working conditions. . . .

> [57] The analyses differ in some important aspects that might affect a plaintiffs litigation strategy. Whereas the burden of proof shifts to the employer in an EPA claim, the burden of persuasion remains with the plaintiff in a Title VII case. *See Fallon v. Illinois*, 882 F.2d 1206, 1213 (7th Cir. 1989). Another procedural advantage EPA claims have over Title VII claims is that no proof of discriminatory motive is required to prevail on an EPA claim, whereas such proof is necessary for a disparate-treatment Title VII case. *See, e.g., Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999); *Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 344 n.17 (4th Cir. 1994).

[footnotes other than 57 omitted]

### 2. Interpretation by Regulatory Agencies Entrusted With EPA Enforcement

In regulations implementing the EPA for the private sector, the Labor Department explained (when it was responsible for EPA enforcement regulations) that an employee need not preliminarily defeat EPA affirmative defenses to make out a basic wage discrimination claim, at 29 CFR 800 (taken from 30 FR 11513-14 (Sept. 9, 1965)):

§ 800.141 *Establishing application of an exception.*

(a) The facts necessary to establish that a wage differential has a basis specified in any of the foregoing exceptions are peculiarly within the knowledge of the

employer. If he relies on the excepting language to exempt a differential in pay from the operation of the equal pay provisions, he will be expected to show the necessary facts. Thus, such a showing will be required to demonstrate that a "payment of wages to employees at a rate less than the rate at which he pays employees of the opposite sex is based on a factor other than sex where it appears that such payments are for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions within the meaning of the statute. After careful examination of the legislative history and the judicial precedents, this is believed to be the most reasonable construction of the law and the one which will be approved by the courts. However, because there is some legislative history that could support a different view, the reasons for reaching the foregoing conclusions are explained in some detail in paragraph (b) of this section.

(b) The legislative history of the Equal Pay Act amendments to the Fair Labor Standards Act includes some statements in the House debate, by a member of the House committee who was an active sponsor of the legislation in the form approved by the committee, expressing a view differing from that stated in paragraph (a) of this section. The opinion expressed in these statements appears to be that the burden of establishing a prima facie case of violation of the equal pay provisions includes not only a showing of the facts necessary to establish a failure to comply with the Act's general standard, but also a showing that no facts exist that could bring the wage differential within an exception. In this view, the employer would not have to show facts necessary to prove the exception as an affirmative defense (Daily Congressional Record, House, May 23, 1963, p. 8698). But if the exceptions are intended to have an exempting effect, as was indicated by House committee spokesmen (H. Rept. No. 309, 88th Cong., 1st sess., p. 3; statement of Subcommittee Chairman Thompson, Daily Congressional Record, House, May 23, 1963, p. 8685), it seems plain that a view such as that expressed above is not consistent with the general rule established by the courts that the application of an exemption under this Act is a matter of affirmative defense and the employer urging such an exemption has the burden of showing that it applies. (See Phillips v. Walling, 334 U.S. 490; Arnold v. Kanowsky, 361 U.S. 388; Walling v. General Industries Co., 330 U.S. 545; Mitchell v. Kentucky Finance Co., 359 U.S. 290.) On balance, it would be difficult to conclude from the legislative history that

> it was the intent of Congress to supersede this established rule by applying a different rule to these provisions than to other exemptions from section 6 or 7. The House committee report emphasized that the "now familiar system of * * * administration, and enforcement, * * * will be utilized fully to complement the new provision" and many statements in the legislative debates as well as the report of the Senate committee further indicate a well-understood legislative intent to apply and enforce the equal pay provisions in a manner consistent with the familiar procedures traditionally followed under the Act in the administration and enforcement of its labor standards. (H . Rept. No. 309, S. Rept. No. 176, 88th Cong. 1st sess.; Daily Congressional Record, House, May 23, 1963, pp. 8692, 8705; Daily Congressional Record, Senate, May 28,1963, pp. 9219-9220). Also pertinent is the understanding expressed by the House sponsors that a "bona fide program" that "does not discriminate on the basis of sex will serve as a valid defense to a charge of discrimination" (H. Rept. No. 309, 88th Cong. 1st sess.; Daily Congressional Record, House, May 23, 1963, p. 8685) and the clarifying remarks of the subcommittee chairman managing the House passed legislation in the Senate, who said: "The employer's defense, if it is based on an employer's plan, must be a bona fide one; and the burden of demonstrating the legitimacy of that defense will rest upon the employer." (Daily Congressional Record, Senate, May 28, 1963, p. 9219). On review of the legislative history as a whole, therefore, the most reasonable conclusion appears to be that the position expressed in paragraph (a) of this section is the better view, and that it is consistent with the legislative intent to consider the statutory exceptions, like other exemptions from section 6, as matters of affirmative defense and to require an employer who believes he comes within them to show facts establishing that this is so.

In 1978, responsibility for EPA enforcement and regulation transferred from the Labor Department to EEOC by Reorganization Plan No. 1 of 1978, Section 1, "Transfer of Equal Pay Enforcement Function." (43 FR 19807 May 9, 1978).

EEOC EPA regulations at 29 CFR Part 1620 do not include the historical discussion found in the DOL regulation. The Commission's regulation provides, 29

CFR 1620.27:

> *Relationship to the Equal Pay Act of title VII of the Civil Rights Act.*
>
> . . .
>
> (c) The right to equal pay under the Equal Pay Act has no relationship to whether the employee is in the lower paying job as a result of discrimination in violation of title VII. Under the EPA a prima facie violation is established upon a showing that an employer pays different wages to employees of opposite sexes for equal work on jobs requiring equal skill, effort and responsibility, and which are performed under similar working conditions. . . .

Section 10 of EEOC's Compliance Manual on "Compensation Discrimination" (Directive 915.003, 2006 WL 4672891), explains of the EPA:

> There is no requirement that the complainant show a pattern of sex-based compensation disparities in a job category. In other words, if a woman is paid less than male employees performing the same work, the lack of other women with low salaries in the job category does not preclude finding an EPA violation as to the complainant. However, the employer's treatment of other women is relevant to the complainant's case—if other women are paid the same as or more than males, this may indicate that a factor other than sex explains the complainant's compensation. [footnote omitted]
>
> [www.eeoc.gov/laws/guidance/section-10-compensation-discrimination]

The regulations of DOL and EEOC deserve deference. Those agencies are entrusted with administration of the EPA. *See Stearn v. Dept. of Navy*, 280 F.3d 1376, 1382 (Fed. Cir. 2002) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984): "Where Congress has delegated authority to the agency to promulgate regulations elucidating statutory provisions, the resulting regulations

"'are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.").

## B. *YANT* DOES NOT INJECT AN ELEMENT OF MOTIVATIONAL OR HISTORICAL ANALYSIS INTO A COMPARATOR-TO-COMPARATOR EPA *PRIMA FACIE* CASE

This Court's relatively few rulings on EPA burdens of proof seemed in accord with the regulatory guidance and *Corning Glass*, *supra,* at least through *Kaplan v. United States,* 727 Fed.Appx. 1011, 1015 (Fed. Cir. 2018) (NP):

> . . . The basic two-part proof scheme under that statute is not in dispute here. As relevant here, a plaintiff may establish a prima facie case of a violation by showing that she was paid "at a rate less than the rate" of her male counterparts for "work . . . requir[ing] equal skill, effort, and responsibility"; and if that is shown, the burden shifts to the government to prove that the payment system in question falls into one of the four enumerated exceptions. *See, e.g., Yant v. United States*, 588 F.3d 1369, 1372 (Fed. Cir. 2009). Proof of payment pursuant to a merit-based system does not require proof that the system is entirely free from subjectivity. *See, e.g., EEOC v. Aetna Ins. Co.*, 616 F.2d 719, 726 (4th Cir. 1980) ("An element of subjectivity is essentially inevitable in employment decisions; provided that there are demonstrable reasons for the decision, unrelated to sex, subjectivity is permissible."); *Harrison-Pepper v. Miami Univ.*, 103 F. App'x 596, 601 (6th Cir. 2004) ("use of subjective criteria does not preclude [a] merit-based system from constituting an affirmative defense").

Cited in *Kaplan*, and relied on by the Claims Court in dismissing Moore's complaint, was *Yant v. United States*, 588 F.3d 1369 (Fed. Cir. 2009), *cert. den.*, 562 U.S. 827 (2010).

*Yant* is distinguishable from, not dispositive of, Moore's claim.

*Yant* involved a consolidated case of several dozen VA nurse practitioners (including several men) who in the Claims Court asserted an EPA violation when they were paid less than physicians' assistants (mostly men) performing work of similar skill, effort, responsibility, and working conditions at VA's Tennessee Valley Healthcare System. Although in the Claims Court VA argued that the EPA does not apply to mixed-gender group, the court determined that those suits were not barred, but the gender ratios were insufficient to establish EPA liability.

This Circuit affirmed the Claims Court's dismissal of the complaint on summary judgment—not, as here, on a motion to dismiss. The Circuit's resolution was that the *Yant* plaintiffs failed to raised a genuine issue of fact that the pay difference in the two groups is or was based on sex. This Court considered *Corning Glass Works v. Brennan*, 417 U.S. 188 (1974), in which the salary difference was between inspectors on night and day shifts. Although the night shift included women, their salaries were lower than men whose salaries were set before women were permitted to work nights. There was, in short, a preexisting salary system, and the Supreme Court determined that its perpetuation violated the EPA. *Corning*'s approach to analysis of historically sex-based disparate pay to groups of employees, "red-circling," is summarized in Lindemann, *et al.*, *Employment Discrimination Law* (ABA 2020), at Chap. 19, p. 22:

> An issue presented primarily in the earlier days of discrimination law is the effect of an employer's attempts to remedy facially unlawful practices. In *Corning Glass Works v. Brennan* the employer had opened its higher-paid jobs to be bid on by women and argued that this action cured prior violations of the Act. The Supreme Court held, however, that the wages of the female employees performing equal work remained unlawfully depressed and had to be raised to the higher level that the men enjoyed, even though the higher-paying classification no longer was sex-segregated.
>
> The practice of "red-circling"[78] pay rates presents a related issue. In *Corning Glass*, the employer had red circled the higher rates being paid to existing male employees, but paid all new hires, male and female, at a lower rate. The Supreme Court rejected the defense that red-circled rates were a sex-neutral justification for a wage differential because equalization of the rates on the EPA's effective date would have placed all employees at the higher, red-circled rate. However, an employer's policy of temporarily preserving the higher wage of an employee who is displaced into a lower classification may constitute a legitimate "factor other than sex, immunizing the employer from liability for that portion of a wage differential.
>
>> [78] An employer "red circles" a pay rate when it elects to maintain an employees current rate of pay notwithstanding that the employee is demoted, or his job is reclassified downward, and the lower position or classification normally would call for a lower pay rate. [footnotes other than 78 omitted]

In *Yant*, this Circuit distinguished the facts of *Corning*, although this Court considered the causation for the complained-of wage differentials among groups of employees, *id.*, 588 F.3d at 1372-74:

> A key distinction between *Corning Glass Works* and the case before us is how the differential in pay arose. In *Corning Glass Works*, "[t]he differential arose simply because men would not work at the low rates paid women inspectors." *Id.* at 205. In other words, the difference in pay was based solely on gender. As such, and consistent with the language of the statute, this was a violation of the

Equal Pay Act. *See* 29 U.S.C. § 206(d)(1) ("No employer having employees subject to any provisions of this section shall discriminate . . . between employees on the basis of sex . . . ." (emphasis added)). This also finds support in the legislative history. *See, e.g.*, H.R. Rep. No. 88- 309, at 3 (1963) (noting that the Equal Pay Act "declares that wage differentials based solely on the sex of the employee are an unfair labor standard" (emphasis added)); 109 Cong. Rec. 9196 (1963) (statement of Rep. Thompson) ("[The Equal Pay Act] only applies to instances where men and women are doing work and where there is a wage differential based solely on sex." (emphasis added)).

Here, the pay differential between NPs and PAs is based on two separate pay scales, one that is regionally based (the NP scale) while the other is nationally based (the PA scale). In fact, the *Yant* plaintiffs concede that prior to 1991 both NPs and PAs were paid on the same national salary scale. Based on the current NP and PA pay scales, the salary for NPs exceeds that of PAs in some areas of the country. In these areas, it is the male PAs that seek relief under the Equal Pay Act, alleging that the predominantly female NPs are paid more for equal work. *See, e.g.*, *Alverson v. United States*, 88 Fed. Cl. 331 (2009). The result is that both male and female NPs seek succor under the Equal Pay Act in one region, and simultaneously male and female PAs in a different region seek the same relief.

The *Yant* plaintiffs did not present any evidence that the decision to pay PAs on a national scale and NPs on a regional scale had any basis in sex, historically or presently. Other courts have held that proof of discriminatory intent is not required to establish a prima facie case under the Equal Pay Act, *see, e.g.*, *Peters v. City of Shreveport*, 818 F.2d 1148, 1153 (5th Cir. 1987), *abrogated on other grounds*, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), but there is a fundamental difference between a showing of discriminatory intent and a showing that discrimination based on sex exists or at one time existed.

An examination of congressional intent clearly evidences that the burden is on the plaintiff to show the latter. "I should like to make it clear that the burden of proof to show a violation is on the Secretary of Labor; he must prove that any differential in pay which exists is actually based on sex, and he will have to sustain that burden of proof. I think this is a very important part of the

> legislative history." 109 Cong. Rec. 9208 (1963) (statement of Rep. Griffin). Representative Goodell's remarks, which echo this view, are instructive as he was the principal proponent of the bill. *County of Washington v. Gunther*, 452 U.S. 161, 171 (1981). He explained that "[t]he Secretary would have to establish a prima facie case showing that there is discrimination based on the factor of sex. If that is done, then, of course, the employer could rebut the proof and show that the differential was based upon factors other than sex." 109 Cong. Rec. 9208 (1963); *see also id.* ("If [the employer] has a reasonable standard of differentiation, the [plaintiff] is not to come in, even, and judge the reasonableness or unreasonableness of this differentiation among employees, except as it shows a clear pattern of discrimination against sex.").
>
> Mere reliance on gender ratios of two groups does not establish discrimination based on sex. In fact, an example in the legislative history explicitly cautions against applying the Equal Pay Act in a situation similar to the facts here: "We do not have in mind the [plaintiff] going into an establishment and saying, 'Look, you are paying the women here $1.75 and the men $2.10. Come on in here, Mr. Employer, and you prove that you are not discriminating on the basis of sex.'" *Id.* (statement of Rep. Goodell).

Judge Prost offered a concurring decision in *Yant*, harkening to the point that a basic EPA complaint need not demonstrate an intent to discriminate based on sex, *id.*, 588 F.3d at 1375-76:

> The majority agrees that summary judgment is appropriate, but discards the trial court's reasoning; instead, the majority imports a novel requirement into the plaintiff's *prima facie* case in granting summary judgment where "the plaintiffs have failed to raise a genuine issue of material fact that the pay differential between NPs and PAs is either historically or presently based on sex." Maj. Op. at 5. As the majority recognizes, the EPA does not require a discriminatory intent. Nevertheless, it proceeds to state that "there is a fundamental difference between a showing of discriminatory intent and a showing that discrimination based on sex exists or at one time existed." In attempting to draw this line, the majority fails to recognize the fundamental difference between establishing a *prima facie* case sufficient to survive a

motion for summary judgment and ultimate success on the merits.

The EPA provides, in relevant part:

> No employer having employees subject to any provisions of this section shall discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, *except where* such payment is made pursuant to (I) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . .

29 U.S.C. § 206(d)(1) (emphasis added). By establishing all of the elements of his or her *prima facie* case—"that an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions,'" *Corning*, 417 U.S. at 195—a plaintiff has effectively shown that discrimination based on sex exists or at one time existed, at least for purposes of surviving a motion for summary judgment. Nothing else is required.

The majority's misreading becomes apparent when it focuses upon the fact that "the pay differential between NPs and PAs is based on two separate pay scales, one that is regionally based (the NP scale) while the other is nationally based (the PA scale)." Maj. Op. at 6. This fact has nothing to do with the plaintiffs' *prima facie* case, and to discuss it in this context is to conflate the plaintiffs' burden to establish a prima facie case under the EPA with the government's burden to prove that any pay differential is "based on any other factor other than sex." 29 U.S.C. § 206(d)(1)(iv); *see Corning*, 417 U.S. at 196 (after plaintiffs establish a prima facie case, "the burden shifts to the employer to show that the differential is justified under one of the Act's four exceptions"). Indeed, the majority makes this explicit, stating that "[t]he Yant plaintiffs did not present any evidence that the decision to pay PAs on a national scale and NPs on a regional scale had any basis in sex, historically or presently."

> Assuming arguendo that the plaintiffs otherwise established a prima facie case, however, it is the government's burden to prove that the pay scales did not have any basis in sex. On these facts, it may well be that the government would carry that burden, but that is not the question to be answered at this stage in the proceedings.
>
> Thus, I concur in the result because I would affirm the trial court based on the composition of the mixed-gender groups in this case (see Part I), but not for the reasons articulated by the majority.

The Claims Court long held that a *prima facie* case for comparator employees does not require pleading or proving discriminatory intent, *Molden v. U.S.*, 11 Cl. Ct. 604, 610 (1987):

> Defendant contends that an element of establishing a *prima facie* case is that the wage disparities of an Equal Pay Act violation must be based on sex discrimination. This contention is not supported by the language of the Act or from judicial interpretations of the law. The United States Court of Appeals for the Fifth Circuit in *Hodgson v. American Bank of Commerce*, 447 F.2d 416 (5th Cir.1971), faced with the question of whether the plaintiff had to show that the wage disparity was sex based, held that the plaintiff had no such burden. Id. at 420. Defendant argued that in *Hodgson v. Coming Glass Works*, 474 F.2d 226 (2d Cir.1973), *ajfd*, *Coming Glass Works v. Brennan*, 417 U.S. 188, 94 S.Ct 2223, 41 L.Ed.2d 1 (1974), the court implied that sexual bias must be shown. 474 F.2d at 231. However, *Hodgson* is based on *Shultz v. Wheaton Glass Co.*, 421 F.2d 259 (3rd Cir.1970), and that the court in *Shultz* found that the burden of proving sexual bias was met solely by showing the existence of a wage differential between male and female employees doing equal work. *Id.*

However *Yant* may apply to cases not involving large groups of employees with varying gender compositions, Moore's case is distinguishable from *Yant*.

First, *Yant* was resolved on summary judgment. Moore's case was assessed

only on a motion to dismiss evaluating the legal sufficiency of his complaint. Moore did not have discovery to allow for factual development of components of his case and the SEC's likely affirmative defenses, e.g., whether SEC had in its records the evidence necessary to evaluate his proper salary level without a current resume and formal application for the transition program; whether there was a financial reason for SEC to exclude Moore from the program despite a belated expression of his interest in it; whether there was any justification offered by SEC for prohibiting pay transition consideration for employees on an ongoing basis, rather than a month or so in 2014; whether, and under what circumstances, pay transition was applied to employees who missed the 2014 deadline.

Second, there is no support, leaving aside the *Gordon* decision, *post*, for a requirement of pleading some type of historical or present and intentional discrimination as the initial stage of an EPA comparator-to-comparator case. *See Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 640 (2007) (""In particular, the EPA does not require the filing of a charge with the EEOC or proof of intentional discrimination. *See* § 206(d)(1) (asking only whether the alleged inequality resulted from "any other factor other than sex'").

The Circuits are in accord. An allegation of intent (by allegations of historical patterns of discrimination or present intentional discrimination) is not required for an

EPA complaint to avoid immediate dismissal. *See Goodrich v. IBEW,* 815 F.2d 1519, 1522 (D.C. Cir. 1987) ("In order to make a *prima facie* showing under the Act, Goodrich had to prove that the IBEW paid lower wages to her than to her male co-workers, "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. Sec. 206(d)(1)"); *Winkes v. Brown University*, 747 F.2d 792, 793 (1st Cir. 1984) ("Winkes established his *prima facie* case by demonstrating that he and Zerner were paid different salaries for jobs that were comparable with respect to skill, effort, responsibility, and working conditions. The burden was on Brown, therefore, to prove the applicability of any one of the four exceptions in the Act. . . ."); *Ryduchowski v. Port Auth. NY and NJ*, 203 F.3d 135, 142 (2nd Cir. 2000) ("However, unlike Title VII, the EPA does not require a plaintiff to establish an employer's discriminatory intent."); *EEOC v. State of Del. Dept. of Health and Social Services*, 865 F.2d 1408, 1414 n.8 (3rd Cir. 1989) ("To prevail on an Equal Pay Act claim, a plaintiff need not prove that the employer intended to discriminate.. . ."); *EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018) ("An EPA plaintiff need not prove that the employer acted with discriminatory intent to obtain a remedy under the statute."); *Peters v. City of Shreveport*, 818 F.2d 1148, 1153 (5th Cir.1987) ("Unlike the showing required under Title VII's disparate treatment theory, proof of

discriminatory intent is not required to establish a *prima facie* case under the Equal Pay Act."); *Beck-Wilson v. Principi*, 441 F.3d 353, 360 (6th Cir. 2006) ("'Unlike the showing required under Title VII's disparate treatment theory, proof of discriminatory intent is not required to establish a *prima facie* case under the Equal Pay Act."); *Fallon v. State of Ill.*, 882 F.2d 1206, 1213 (7th Cir. 1989) ("'the Equal Pay Act creates a type of strict liability in that no intent to discriminate need be shown."); *Strecker v. Grand Forks County Social Service Bd.*, 640 F.2d 96, 109 n1. (8th Cir. 1981) ("The Equal Pay Act creates a type of strict liability; no intent to discriminate need be shown." . . .); *Maxwell v. City of Tucson*, 803 F.2d 444, 446 (9th Cir. 1986) ("The Equal Pay Act creates a type of strict liability; no intent to discriminate need be shown."); *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1310-11 (10th Cir. 2006) ("The EPA, however, has been described as imposing a form of strict liability on employers who pay males more than females for performing the same work—in other words, the plaintiff in an EPA case need not prove that the employer acted with discriminatory intent."); *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992) ("Once the disparity in pay between substantially similar jobs is demonstrated, the burden shifts to the defendant to prove that a "factor other than sex" is responsible for the differential. If the defendant fails, the plaintiff wins. The plaintiff is not required to prove discriminatory intent on the part of the defendant.").

## C. THE *GORDON* DECISION WAS VACATED AND DOES NOT REQUIRE APPLICATION OF *YANT* TO A BASIC EPA COMPARATOR CASE

From the 2009 *Yant* and April 2018 *Kaplan* decisions, we move to the September 2018 decision, *Gordon v. United States*, 903 F.3d 1248 (Fed. Cir. 2018), *vacated*, 754 Fed. Appx. 1007 (Fed. Cir. 2019), involving facts more closely aligned than *Yant* with a traditional EPA comparator case.

Gordon and another female emergency medical doctor with the VA in Little Rock sued under the EPA asserting that the complex VA physician compensation system resulted in lower pay for them compared with several male emergency department physicians.

In the Claims Court, the Government argued in summary judgment, following discovery, that the complainants failed to prove either a *prima facie* case of an EPA or violation or that the pay disparities were due to reasons other than sex. The Claims Court did not rule on the *prima facie* case, but instead decided that the plaintiffs did not show that discrimination was the reason for the pay disparities and delayed pay adjustments.

This Court affirmed summary judgment against Dr. Gordon and her colleague, relying on *Yant*—but without analysis of a traditional comparator case at the initial pleading stage, when the complaint is challenged through a motion to dismiss because

it does not state a claim sufficient to move to discovery and summary judgment or trial. At the onset of *Gordon v. United States*, 903 F.3d 1248 n.1 (Fed. Cir. 2018), this Court referenced the Supreme Court's *Ledbetter* decision:

> The EEOC is a separate avenue of relief for an Equal Pay Act claim. An individual alleging an Equal Pay Act violation may go directly to court or file an EEOC charge. *See generally Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 640, 127 S.Ct. 2162, 167 L.Ed.2d 982 (2007) (noting that "the [Equal Pay Act] does not require the filing of a charge with the EEOC or proof of intentional discrimination"), *superseded by statute on other grounds*, Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2 (2009).

*Gordon* explained the general requisites of an EPA case, *id.*, at 1252-54:

> To make a prima facie case of an EPA violation, a plaintiff must show that the employer paid employees of opposite sexes different wages for equal work for jobs that require "equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1); *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974). This court's decision in *Yant v. United States* further requires that, as part of the prima facie case, an EPA plaintiff bears the burden of showing "that discrimination based on sex exists or at one time existed." 588 F.3d 1369, 1373 (Fed. Cir. 2009). Once an employee in an EPA case establishes a prima facie case of salary discrimination, the burden of persuasion shifts to the employer to prove that the wage disparity was justified by one of four permissible reasons: (1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality of output; or (4) a disparity based on any factor other than sex. 29 U.S.C. § 206(d)(1).
>
> We begin with Appellants' prima facie case of salary discrimination. Appellants must demonstrate that the CAVHS pays different wages to employees of the opposite sex; that the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and that the jobs are performed under similar working conditions. *See Corning Glass Works*, 417 U.S. at 195. Concerning whether the CAVHS pays different wages to employees of the

opposite sex, Appellants point to Dr. Iftikhar Ali, whom they alleged was hired to an identical position as Appellants and initially paid the same salary. Dr. Ali received a market pay raise from the VA after only one year, whereas Appellants had only received step increases in base pay for their first two years, without any increase in market pay. J.A. 15. Appellants also point to a pay table identifying ten male ER physicians who were paid more than they were. J.A. 22. In light of Dr. Ali and the pay table, Appellants have raised a genuine issue of material fact as to whether the CAVHS pays different wages to employees of the opposite sex.

The next facet of the *prima facie* case is whether the male employees performed equal work on jobs requiring equal skill, effort, and responsibility, and whether the jobs were performed under similar working conditions. A "bird's eye" comparison based on the same general duties cannot establish equal work. *Wheatley v. Wicomico Cty.*, 390 F.3d 328, 333–34 (4th Cir. 2004) ("We decline to hold that having a similar title plus similar generalized responsibilities is equivalent to having equal skills and equal responsibilities."). Job titles or job classifications are not necessarily determinative in determining whether work is substantially equal for purposes of an EPA claim; rather, the controlling factor is the actual job duties of Appellants and their comparators. *See Santiago v. United States*, 107 Fed. Cl. 154, 161 (2012). Importantly, "jobs need not be identical in every respect before the Equal Pay Act is applicable." *Corning Glass Works*, 417 U.S. at 203 n.24.

Here, Appellants point to Dr. Ali, who was hired at the same time and for the same position as Appellants, as an example of a male employee performing similar job duties under substantially the same working conditions. Appellants additionally point to a statement from Dr. James Rasch, head of the ER department, as evidence that the male doctors were performing substantially similar work; Dr. Rasch stated that "basically [ER physicians] all do the same type of work, but their qualifications may—there may be some variation in their qualifications." J.A. 23. Appellants also point to Chief of Staff Dr. Margie Scott's statement that "[t]he work provided by each of the physicians within the emergency department I would agree is equal in amount and scheduling. I'm not aware of any differences in the work schedules." J.A. 24.

The Government contends that Appellants incorrectly rely on three doctors—Drs. Kyser, Rayaz, and Snodgrass—because these doctors either are in a supervisory role, and thus have additional duties and responsibilities, or have a different role and less responsibility. Appellee's Br. 22, 25–26. This is an affirmative defense argument. Assuming the Government is correct, Appellants have alleged the existence of the seven other male doctors, including Dr. Ali, who Appellants allege are paid more than Appellants for substantially equal work. *See, e.g.*, Appellants' Opening Br. 11. The Claims Court made no finding as to whether these male doctors are proper comparators.

To survive summary judgment, Appellants need only raise a genuine issue of material fact as to whether the male doctors are comparators. The Claims Court effectively highlighted that evidence relating to Dr. Ali raises a genuine issue of material fact. *Gordon*, 130 Fed. Cl. at 611 ("Dr. Ali, a male colleague who was hired at the same time as plaintiffs, received a raise after his first year of employment while plaintiffs[] were ineligible for raises until 2010. The reason for this apparent disparity remains unclear and essentially unexplained by the parties."); *see also U.S. EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 122 (4th Cir. 2018) ("The undisputed facts in the present record establish that each claimant earned less than at least one male comparator performing substantially equal work. These undisputed facts alone satisfy the EEOC's prima facie burden.").[3] The record shows that Appellants have raised a fact issue that CAVHS employees of different sex performing equal work on jobs requiring equal skill, effort, and responsibility under similar working conditions were paid differently.

> [3] To be clear, merely identifying one comparator alone may not necessarily establish a prima facie case of an EPA violation in every case. *See, e.g., Brousard v. Norcross v. Augustana Coll. Ass'n*, 935 F.2d 974, 979 (8th Cir. 1991) (affirming summary judgment and finding that "a submissible Equal Pay Act claim has not been established" where "the plaintiff's salary is marginally smaller than one comparator and marginally larger than another comparator").

To make their prima facie case, however, Appellants must also establish that the pay differential between the similarly situated employees is "historically or

presently based on sex." *Yant*, 588 F.3d at 1372. Appellants point to no evidence that the pay differential complained of was based on sex, either historically or presently. Instead, Appellants argue that the evidence of clear pay disparities between Appellants and the similarly situated male doctors permits a fact finder to draw an inference that discrimination based on sex exists or existed. Reply Br. 6–7. This court in *Yant*, however, held that plaintiffs bear the burden of showing that the complained-of pay differential is based on sex; allowing a plaintiff to satisfy this requirement merely through an inference drawn from the statutory elements of the prima facie case under the EPA is not sufficient. Thus, because Appellants fail to establish a prima facie case of an EPA violation,[4] summary judgment is appropriate.

> [4] The Government further argues that, even if Appellants had successfully established their prima facie case, the Claims Court correctly found the pay discrepancy to be, at least partly, based on a factor other than sex. Appellee's Br. 31. Specifically, the record reflects that the VHA pay freeze that lasted from December 2010 to December 2013 prevented Appellants from receiving market pay raises during that period that would have brought them closer to their male peers. The Government asserts that, but for the pay freeze, the pay panel's recommended pay increase for Dr. Maxwell in 2010 would have made her pay equal to three of the male comparators on which she relies. *See* J.A. 22, 52.
>
> We note that the pay freeze does not explain why Dr. Ali received a raise in 2009, a year earlier than the similarly situated and simultaneously hired Appellants were even considered for a raise. As noted above, the Claims Court recognized that the Government provided no explanation in the record for Dr. Ali. Gordon, 130 Fed. Cl. at 611. Even so, the evidence in the record does not support a finding that the delay in Dr. Gordon's and Dr. Maxwell's raises, as opposed to Dr. Ali's early raise, was based on sex. *Yant*, 588 F.3d at 1372.

The *Gordon* decision discussed one approach to an EPA case "based on sex" and another, expressed at footnote 3 of the decision, considering a comparator-to-

comparator case:

> [3] To be clear, merely identifying one comparator alone may not necessarily establish a prima facie case of an EPA violation in every case. *See, e.g., Brousard v. Norcross v. Augustana Coll. Ass'n*, 935 F.2d 974, 979 (8th Cir. 1991) (affirming summary judgment and finding that "a submissible Equal Pay Act claim has not been established" where "the plaintiff's salary is marginally smaller than one comparator and marginally larger than another comparator").

The difference in pay between Moore and his female comparators is not marginal. The two approaches are compatible. If the wage differential is based on sex, then it likely will violate the EPA. If there are comparator distinctions, an EPA case is properly pleaded, leaving the parties to sort out through discovery, summary judgment, and possibly trial, application of EPA affirmative defenses. Not clarified in *Yant* or *Gordon* are distinctions in analysis of a motion to dismiss and motion for summary judgment. The first motion tests only the basic complaint. The second motion tests the complaint against the answer and all evidence offered, after discovery. General references to a "prima facie case," must be evaluated in the context of the level of the pleading testing the plaintiff's case.

Judge Reyna provided additional views to the opinion that he wrote on behalf of the *Gordon* panel. Rather than stating that *Yant*'s approach was correct as to a quasi-class action, but that *Yant* was inapplicable to a simple comparator case, Judge

Reyna argued that *Yant* failed properly to apply shifting burdens of proof under EPA and instead required the plaintiff to disprove, as part of a *prima facie* case, a statutory affirmative defense, 903 F.3d at 1254-57:

> I write separately to express my belief that this court's holding in *Yant v. United States*, 588 F.3d 1369 (Fed. Cir. 2009), should be revisited and the requirement that plaintiff prove, as part of their prima facie case under the Equal Pay Act, that the pay differential is presently or historically based on sex be reversed. The *Yant* requirement that a plaintiff bringing suit additionally show that the complained-of difference in pay is presently or historically based on sex improperly shifts the burden from the employer to disprove discrimination to the plaintiff to prove discrimination. Such a shift is improper under the statute and at odds with Supreme Court precedent and the law of other circuits.
>
> In its seminal case on the Equal Pay Act, 29 U.S.C. § 206(d) *et seq*. ("EPA"), the Supreme Court in *Corning Glass Works v. Brennan* characterized the EPA as "broadly remedial," and instructed courts to construe and apply it "so as to fulfill the underlying purposes which Congress sought to achieve"—namely, to "remedy what was perceived to be a serious and endemic problem of [sex-based] employment discrimination in private industry." 417 U.S. 188, 195, 208 (1974). The EPA's basic structure and operation is "straightforward": the plaintiff first carries the burden of showing that an employer pays different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Id.* at 195. To establish a *prima facie* case of wage discrimination under the EPA, "it is merely necessary that the plaintiff show that an employer paid different wages to employees of the opposite sex for substantially equal work." *Molden v. United States*, 11 Cl. Ct. 604, 610–11 (1987). Once the plaintiff has put forth this prima facie case, the burden shifts to the employer "to show that the [pay] differential is justified under one of the Act's four exceptions." *Corning Glass Works*, 417 U.S. at 196.
>
> *Yant* imposes an extra-statutory requirement onto the EPA plaintiff's prima

facie case. As noted by then-Circuit Judge Prost in her concurrence, the decision in *Yant* "imports a novel requirement into the plaintiff's prima facie case in granting summary judgment." *Yant*, 588 F.3d at 1375 (Prost, J., concurring) (emphasis added). Before *Yant*, the EPA simply required a plaintiff to show wage discrimination between employees of different sex—i.e., that employees of different sex were paid differently for the same work under substantially similar conditions. *Yant* requires not only that the plaintiff show wage discrimination, but also sex discrimination—i.e., that the reason for the difference in pay is due to sex.

*Yant* concerned a mixed-sex group of plaintiffs. Nurse practitioners employed by the United States Department of Veterans Affairs brought suit under the EPA alleging that, as predominantly female nurse practitioners, they were paid at a lower rate than the predominantly male physician assistants, performing jobs of equal skill, effort, and responsibility under similar working conditions. *Yant v. United States*, 85 Fed. Cl. 264, 266 (2009). The summary judgment record revealed that the plaintiffs' class was composed of 80% females, while the higher-paid physician assistants were 40% female. *Id.* at 272. The Court of Federal Claims granted summary judgment for the Government, concluding that although a group of plaintiffs does not have to be exclusively one gender to bring an EPA claim, the *Yant* plaintiffs had failed to establish their prima facie case; broadly, the fact that almost half of the putatively disadvantaged sex participated in the higher-paid group was sufficient to deny liability at summary judgment because the plaintiffs failed to establish that the employer paid different wages to employees of opposite sexes. *See id.*

This court affirmed on different grounds. Relevant to this court's analysis was the fact that the two positions at issue were on different pay scales, one national (the physician assistant pay scale) and one regional (the nurse practitioner pay scale). The differing pay scales resulted in the salary for nurse practitioners exceeding that of the physician assistants in some parts of the country, and vice versa in other parts. *Yant*, 588 F.3d at 1373. The court concluded that "the pay differential between [nurse practitioners] and [physician assistants] is based on two separate pay scales," and that the plaintiffs "did not present any evidence that the decision to pay [physician assistants] on a national scale and [nurse practitioners] on a regional scale had any basis in sex, historically or presently." *Id.* The majority acknowledged that

EPA plaintiffs need not present proof of discriminatory intent, but explained that they must nevertheless make a showing that wage "discrimination based on sex exists or at one time existed" as part of their prima facie case. *Id.* The court concluded that the plaintiffs had failed to establish a prima facie case of such discrimination because "[m]ere reliance on gender ratios of two groups [of employees] does not establish discrimination based on sex," and because petitioners presented no evidence that the wage differential between the two employee groups was based upon sex. *Id.* at 1373–74. Because the plaintiffs failed "to raise a genuine issue of material fact that the pay differential between [nurse practitioners and physician assistants] is based on sex," this court found that the plaintiffs "failed to make a prime [sic] facie case." *Id.* at 1374.

Prior to *Yant*, once a plaintiff established a prima facie case under the EPA, discrimination based on sex was presumed. *E.g.*, *Cooke v. United States*, 85 Fed. Cl. 325, 342 (2008) ("Once the plaintiff has met this initial burden, 'the statute presumes discrimination and requires defendant to proffer successfully an affirmative defense' based on one of the statute's four exceptions." (emphasis added) (quoting *Moorehead v. United States*, 84 Fed. Cl. 745, 747 (2008))); *see also Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 344 (4th Cir. 1994) ("Under the Equal Pay Act, the plaintiff creates a presumption of discrimination when she establishes a *prima facie* case."). In other words, the prima facie case of a pay differential between similarly situated employees of different sex itself constitutes evidence of discrimination based on sex.

*Yant* decidedly changed this standard by requiring, as part of the prima facie case, evidence that the pertinent pay differential is based on sex. *Compare Moorehead*, 84 Fed. Cl. at 748 ("[T]he Government's main argument is that the reasons for any pay disparity are not gender based. This argument, however, is not pertinent to whether plaintiff can establish a prima facie case." (citation omitted)), and *Molden*, 11 Cl. Ct. at 610 ("Defendant contends that an element of establishing a prima facie case is that the wage disparities of an Equal Pay Act violation must be based on sex discrimination. This contention is not supported by the language of the Act or from judicial interpretations of the law."), with *Yant*, 588 F.3d at 1374 ("Because the *Yant* plaintiffs fail to raise a genuine issue of material fact that the pay differential between [nurse practitioners] and [physician assistants] is based on sex, they have failed to make a prime [sic] facie case."), and *Branch v. United States*, 101 Fed. Cl. 411,

414 (2011) ("To establish an EPA violation, a plaintiff must show (1) 'past or present discrimination based on sex,' and (2) that he 'performed work equal in skill, effort and responsibility' to that of a comparator." (quoting *Yant*, 588 F.3d at 1374)).

*Yant* shifts the burden onto the plaintiff to affirmatively prove discrimination, rather than on the employer to disprove discrimination. The Supreme Court in *Corning Glass* made clear that the EPA plaintiff has the burden of initially showing that the employer pays workers of one sex more than workers of the opposite sex for equal work. 417 U.S. at 196. After this prima facie case is established, the burden of both production and persuasion shift to the employer to show, as an affirmative defense, that the pay differential is due to one of four reasons permitted under the statute, namely a seniority, merit, or production output system, or any differential based on a factor other than sex. *Id.* at 196–97; *BrinkleyObu*, 36 F.3d at 344. "[T]he risk of nonpersuasion rests with the employer on the ultimate issue of liability," *Fallon v. Illinois*, 882 F.2d 1206, 1213 (7th Cir. 1989), and accordingly, once the plaintiff raises a prima facie case of pay discrimination, unless the employer can prove that "one or more affirmative defenses are applicable . . . , the plaintiff will prevail." *EEOC v. Md. Ins. Admin.*, 879 F.3d 114, 120 (4th Cir. 2018).

Thus, *Yant*'s requirement that the plaintiff prove that the complained-of pay differential is based on sex is nonsensical given the employer's clear burden under the statute and *Corning Glass* to disprove that any pay differential between employees of opposite sex performing substantially the same work is based on sex. No other circuit imposes such a requirement on the plaintiff. *See, e.g.*, *Rizo v. Yovino*, 887 F.3d 453, 459 (9th Cir. 2018); *Md. Ins. Admin*, 879 F.3d at 120; *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1312 (10th Cir. 2006); *Stanziale v. Jargowsky*, 200 F.3d 101, 107–08 (3d Cir. 2000); *BrinkleyObu*, 36 F.3d at 344; *Plemer v. Parsons-Gilbane*, 713 F.2d 1127, 1136 (5th Cir. 1983).

*Yant*'s requirement that an EPA plaintiff must affirmatively prove that a pay differential between employees of different sexes is historically or presently based on sex is at odds with the broadly remedial nature of the EPA to redress wage discrimination between employees of different sex. Because its holding is counter to the statutory structure, the Supreme Court's precedent, and the

law of other circuits, I urge this court to consider revisiting this precedent. Complicating matters, the *Gordon* decision was vacated, 754 Fed. Appx. 1007 (Fed. Cir. 2019), leaving uncertain its precedential or persuasive authority.

A vacated appellate decision is of no precedential effect. *See County of Los Angeles v. Davis*, 440 U.S. 625, n.6 (1979). A vacated opinion has precedential value only if has been later validated by the court. *See Alvarado v. Board of Trustees of Montgomery Community College*, 848 F.2d 457, 459 (4th Cir. 1988).

According to *United States v. Munsingwear*, 340 U.S. 36, 40-41 (1950), at least as to a case that has gone to the Supreme Court, with a vacated appeals court decision the parties are then left to relitigate issues, and "none is prejudiced by a decision which in the statutory scheme was only preliminary," avoiding "spawning any legal consequences."

A commentator remarked:

> Vacated opinions lose their precedential value simply by virtue of the designation "vacated." In the American legal system, reliance on a vacated decision is to invite ridicule at best, disaster at worst. Because the system places a high value on "authority," i.e., prior case law supporting a litigant's position, a vacated opinion carries little weight. This is true partly because courts seldom publish opinions explaining why they are vacating a decision. Without such an explanation, a litigant or court cannot determine whether the legal underpinnings of the vacated decision remain sound. In addition, many vacated decisions vanish entirely from the law books. If a decision is vacated before it appears in a bound volume of a law reporter, only a simple note stating that the opinion has been vacated will await the curious legal

researcher. [footnotes omitted]

Deyling, Robert P., *Dangerous Precedent: Federal Government Attempts to Vacate Judicial Decisions upon Settlement*, 27 J. Marshall L. Rev. 689, 693 (1994).

Were *Gordon* not vacated, Moore's recourse might be to seek *en banc* consideration here—if *Gordon* determined that *Yant* applied to traditional EPA comparator cases. If, as argued here, *Yant* does not apply to comparator cases like Moore's, or if *Gordon* permits a basic comparator case to be pleaded without alleging at the complaint stage historical or present discrimination, there is no need now to seek *en banc* consideration of Moore's appeal.

This leads back to whether Moore's complaint should have been dismissed for failure to state an EPA claim. He alleged a substantial pay disparity in work performed by comparator female employees. That left the Government to assert and prove its EPA affirmative defenses, including the statutory defense that the disparity was the result of factors other than sex, subject to rebuttal evidence and argument.

If Moore must plead, as part of his complaint, just to stay in court, that the disparity is because of sex by asserting allegations of intentional current or historical discrimination, the "other than sex" EPA affirmative defense and defendant's associated burden of proof vanish. Negation of statutory terms is discouraged, *Wolfe v. McDonough*, ___F.4th___ (Fed. Cir. 2022):

> It is a "fundamental canon of statutory construction" that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning[] . . . at the time Congress enacted the statute." *Perrin v. United States*, 444 U.S. 37, 42 (1979). The presumption against surplusage additionally provides that a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (citing 2A Norman J. Singer, Statutes and Statutory Construction § 46.06, at 181–86 (rev. 6th ed. 2000)).

*Yant* does not dictate application to comparator-to-comparators cases of the analysis for a mixed-gender quasi-class action involving possible disparate impact of wage setting procedures, although *Gordon*, if it has precedential or compelling persuasive value, possibly may suggest that approach. But given the remarks of Judge Prost in *Yant*, the intent of footnote 3 of the *Gordon* decision, and the additional views of Judge Renya in *Gordon,* that approach cannot be favored, because it is contrary to the precedent from the Supreme Court and circuit court decisions earlier discussed in this brief. Academic commentary on this Circuit's revisions of EPA burdens of proof has not been favorable. Savage, Mariah, *Money Talks: Using Prior Salary as an Affirmative Defense in Equal Pay Claims*, 2020 Utah L. Rev. 289, No. 1 , Article 5, p. 300, n.76:

> The Federal Circuit, however, appears to be an outlier. In *Yant v. United States*, the Federal Circuit held that an EPA plaintiff must make a prima facie showing that "discrimination based on sex exists or at one time existed" in addition to the statutory requirements required by the Equal Pay Act discussed *supra* Part III.A. 588 F.3d 1369, 1373 (Fed. Cir. 2009); *see also Gordon v. United States*,

903 F.3d 1248, 1254, 1256 (Fed. Cir. 2018) (vacated on other grounds) (Reyna, J., additional views) (noting that the holding in *Yant* is "at odds with Supreme Court precedent and the law of other circuits" by improperly "shift[ing] the burden onto the plaintiff to affirmatively prove discrimination, rather than on the employer to disprove discrimination" with an affirmative defense).

Although the Claims Court did not dismiss Moore's complaint based on Moore's failure to apply during open period for pay transition, Appellant does not ignore the issue, and it was briefed to the Claims Court. There are factual issues as to whether an application should have been necessary or whether the open period should have been waived. Those issues cannot be resolved without some discovery prior to briefing of summary judgment motions, or trial. Moore's complaint asserted that SEC already had his resume (a part of his job application process) as well as all other information essential to evaluate his duties and performance, Complaint ¶13, Appx60. Whether, under those circumstances, a resume and a separate pay transition application during a limited time period were reasonable business necessities for pay transition consideration for Moore will likely be disputed factual issues, as will be the funding limitations for the seemingly perpetual pay transition benefits. (The pay transition adjustments were apparently permanent, that is, continuing, and funded on an annual basis according to the SEC IG's review.) Appx12. And there is the question of whether EPA protection is lost because someone doesn't apply for a pay raise that

is later given to someone of different sex doing the same work, requiring the same effort, and under the same working conditions. EPA is part of FLSA. Its benefits cannot prospectively be waived. *Boaz v. FedEx Customer Information Services, Inc.*, 725 F.3d 603, 607 (6th Cir. 2013); *see Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 707 (1945); 29 CFR 541.4; *cf. Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51 (1974).

## VII. CONCLUSION AND RELIEF SOUGHT

Moore's complaint stated an EPA claim as a matter of law. The judgment and opinion below should be reversed or vacated and the matter remanded to the Claims Court for further adjudication.

Respectfully submitted,

/s/ Peter Broida

---

Peter Broida
Suite 203
1840 Wilson Blvd.
Arlington VA 22201
Telephone: 703-841-1112
Facsimile: 703-841-1006
peterbroida@gmail.com

Attorney for Timothy Moore

# CERTIFICATE OF COMPLIANCE

I certify that through use of the WordPerfect word-counting feature, that there are 13,336 words in this brief. This complies with the word limits of this Court's rules.

/s/ Peter Broida

Peter Broida
Suite 203
1840 Wilson Blvd.
Arlington VA 22201
Telephone: 703-841-1112
Facsimile: 703-841-1006
peterbroida@gmail.com

Attorney for Timothy Moore

April 8, 2022

# APPENDIX

# TABLE OF CONTENTS

Court of Federal Claims Decision in *Moore v. US*,
No. 1:21-cv-01931-CFL (Jan 27, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Judgment in *Moore v. US*,
No. 1:21-cv-01931-CFL (Jan 27, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Docket Entries in *Moore v. US*,
No. 1:21-cv-01931-CFL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SEC September 22, 2014, "Pay Transition Update" . . . . . . . . . . . . . . . . . . . . . . . . 9

SEC OIG "Review of SEC's Pay Transition Program" (Jan. 27, 2016) . . . . . . . . 11

Performance Work Plan for Tim Moore (2014-15) . . . . . . . . . . . . . . . . . . . . . . . 22

Performance Work Plan for Katherine Monahan (2014-15) . . . . . . . . . . . . . . . . 33

Performance Work Plan for Christine Curley (2014-15) . . . . . . . . . . . . . . . . . . . 44

Tim Moore's Complaint in the Court of Federal Claims (Sept. 30, 2021) . . . . . . 57

# In the United States Court of Federal Claims

No. 21-1931

(Filed: January 27, 2022)

| | |
|---|---|
| TIMOTHY MOORE,<br>Plaintiff,<br>v.<br>UNITED STATES,<br>Defendant. | Claims under the Equal Pay Act, 29 U.S.C. § 206(d)(1), and Back Pay Act, 5 U.S.C. § 5596; failure to state a claim, RCFC 12(b)(6) |

Peter B. Broida, Arlington, Virginia for plaintiff.

Rafique O. Anderson, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for defendant. With him on the briefs were Brian M. Boynton, Acting Assistant Attorney General, and Patricia M. McCarthy, Director, and Deborah A. Bynum, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel was Paul R. Brockmeyer, Senior Trial Counsel, United States Securities and Exchange Commission, Washington, D.C.

## OPINION AND ORDER

LETTOW, Senior Judge.

Pending before the court is defendant's motion to dismiss plaintiff's complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). *See* Def.'s Mot. to Dismiss ("Def.'s Mot."), ECF No. 5. Plaintiff, Timothy Moore, alleges that the difference in pay between himself and two female employees at the U.S. Securities and Exchange Commission ("SEC") violates the Equal Pay Act, 29 U.S.C. § 206(d)(1), and the Back Pay Act, 5 U.S.C. § 5596. *See* Compl. ¶ 1, ECF No. 1. The matter is fully briefed and ready for disposition. *See* Pl.'s Opp'n, ECF No. 6; Def.'s Reply, ECF No. 10. For the following reasons, the court GRANTS the government's motion to dismiss Mr. Moore's complaint.

## BACKGROUND[1]

[1] The recitations that follow do not constitute findings of fact, but rather are recitals attendant to the pending motion and reflect matters drawn from the complaint and the parties' briefs.

In 2014, the SEC began a process to adjust the pay of many of its employees pursuant to an agreement with the union that represents its non-management employees. Compl. ¶ 5. Salary adjustments under this process began in mid-2015 and applied to all SEC staff. Compl. ¶ 5. To be considered for a pay adjustment, employees were required to "submit an application stating their interest and supplying a resume that was to include work history, job titles, job duties, start and end dates for jobs, and full or part-time status." Compl. ¶ 6. The application period was open "from approximately September 14, 2014, through October 14, 2014." Compl. ¶ 6.

Mr. Moore "did not apply for pay transition during the open period because of issues of a personal, family-related nature." Compl. ¶ 8. Two fellow SEC employees, both female, "applied for pay transition consideration within the open period." Compl. ¶ 7. Accordingly, in mid-2015, the first of these two female comparators received a "pay transition from approximately $175,534, to approximately $195,438, [which] has since increased to about $236,000." Compl. ¶ 9. Around the same time, the second female comparator received a "pay transition from approximately $144,291 to approximately $169,269, [which] has since increased to about $212,000." Comp. ¶ 10. At the time that the comparators' salary was adjusted, Mr. Moore's "salary was approximately $145,608," and it is currently "about $195,000." Compl. ¶ 12. Had it been adjusted at the same time as the comparators, plaintiff asserts that his salary would now equal "around $216,000." Compl. ¶ 12. Mr. Moore avers that the work that he and these two women perform "is the same or substantially similar, and . . . requires equivalent skill, knowledge, ability, and effort." Compl. ¶ 11. Mr. Moore admits that the remuneration of the two female comparators was recalibrated through the Pay Transition Program and not because of their sex. *See* Comp. ¶¶ 7, 9-10.

In August and September 2016, after the pay transition program application deadline, Mr. Moore learned of the difference in pay between himself and the comparators and requested permission to be considered for the transition program. Compl. ¶ 14. Plaintiff's request was denied. Compl. ¶ 14. Contrastingly, Mr. Moore claims that "[a]bout ten other SEC employees who were impacted by extenuating circumstances were allowed to apply for pay transition in November and December of 2014." Compl. ¶ 14. Plaintiff eventually initiated a complaint before the Equal Employment Opportunity Commission, which resulted in a judgment in favor of the SEC in 2021. *See* Compl. ¶ 15; *Moore v. Lee*, EEOC No. 531-2020-00331X (June 17, 2021).

Mr. Moore asserts in his complaint that SEC management already had all the necessary documents to consider him for the pay adjustment program before the deadline; namely, his resume, work history, and full-time work status. Compl. ¶ 13. Plaintiff claims that the "SEC lack[ed] an acceptable business reason" to adjust the two female comparators' salaries but not his and to decline to extend the deadline when he requested it. Compl. ¶ 17. Therefore, according to Mr. Moore, the SEC has been violating the Equal Pay Act since mid-2015. Compl. ¶ 18.

**STANDARD FOR DECISION**

Under RCFC 12(b)(6), a complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007)).[2] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The factual matters alleged "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555-56 (citations omitted).

When reviewing the complaint, "the court must accept as true the complaint's undisputed factual allegations and should construe them in a light most favorable to the plaintiff." *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009) (citing *Papasan v. Allain*, 478 U.S. 265, 283 (1986)) (additional citation omitted). Conclusory statements of law and fact, however, "are not entitled to the assumption of truth" and "must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. "'[N]aked assertion[s]' devoid of 'further factual enhancement'" are insufficient to state a claim. *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557); *accord Bradley v. Chiron Corp.*, 136 F.3d 1317, 1322 (Fed. Cir. 1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

## ANALYSIS

To prevail against the government's motion to dismiss, Mr. Moore must demonstrate that the factual assertions in his complaint make it more than speculative that the SEC violated the Equal Pay Act, 29 U.S.C. § 206(d)(1), which states:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions . . . .

In essence, "[t]o establish a *prima facie* case under the Equal Pay Act, a plaintiff must establish that he or she received a lower wage for performing 'equal work requiring equal skill, effort, and responsibility' to that carried out by a comparator of the opposite sex under similar working conditions." *Jordan v. United States*, 122 Fed. Cl. 230, 241 (2015) (alterations omitted) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974) (additional citations omitted)). The Court of Appeals for the Federal Circuit has explained that, as concerns Equal Pay Act allegations, it is Mr. Moore's burden to "show[] that discrimination based on sex exists or at one time existed." *Yant v. United States*, 588 F.3d 1369, 1373 (Fed. Cir. 2009).[3] In short, to survive

---

[2] Because RCFC 12(b)(6) mirrors Fed. R. Civ. P. 12(b)(6), the rules should be interpreted *in pari materia*.

[3] Mr. Moore contends that a showing of sex discrimination is not required to make a *prima facie* case under 29 U.S.C. § 206(d)(1). Pl.'s Opp'n at 7-8. However, plaintiff relies on decisions from this court that predate the Federal Circuit's decision in *Yant*. *Id.* (citing *Cooke v. United States*, 85 Fed. Cl. 325, 341 (2008) (additional citations omitted)). Decisions within the

dismissal, Mr. Moore's complaint must make more than speculative and conclusory averments that the difference in pay between himself and the two named, female comparators is the result of "past or present discrimination based on sex." *Id.* at 1374.

Mr. Moore's complaint sets out the factual contention that he receives a lower wage than the two named, female comparators. The two named women make, respectively, $236,000 and $212,000, while plaintiff makes $195,000. *See* Compl. ¶¶ 9-12. Mr. Moore's complaint also alleges that plaintiff and the two female comparators are "Examination Managers" at the SEC's SK-15 pay level and perform the same work of managing examinations of regulated entities under the same procedures, Compl. ¶¶ 2-3, 11, which suffices at the 12(b)(6) stage to show that they perform "equal work requiring equal skill, effort, and responsibility," *Jordan* 122 Fed. Cl. at 241 (alterations and quotations omitted). Even so, plaintiff's complaint does not claim that the difference in pay for equal work is the result of "past or present discrimination based on sex." *Yant*, 588 F.3d at 1374. Rather, it delineates a salary adjustment process, resulting in Mr. Moore's lower salary, that was devoid of any sex-based discrimination. The adjustment program "applied to all SEC staff," Compl. ¶ 5, the two female "comparators applied for pay transition consideration within the open period," Compl. ¶ 7, and Mr. Moore "did not apply for pay transition during the open period," Compl. ¶ 8.

Because the complaint affirmatively acknowledges that no sex-based discrimination caused the difference in pay between Mr. Moore and the two named female comparators, plaintiff does not state a *prima facie* violation of 29 U.S.C. § 206(d)(1). *See, e.g., Spellers v. United States,* ____ Fed. Cl. ____, 2021 WL 5630801 (Dec. 1, 2021). The court therefore holds that plaintiff has not "state[d] a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (internal quotations omitted).[4]

---

Federal Circuit's purview that issued after *Yant* recognize the sex discrimination element of a *prima facie* case. *See Gordon v. United States,* 903 F.3d 1248, 1252 (Fed. Cir. 2018), *vacated on other grounds,* 754 Fed. Appx. 1007 (Fed. Cir. 2019). Mr. Moore's opposition even cites one such case. *Id.* at 8 (citing *Kaplan v. United States*, 126 Fed. Cl. 72, 82 (2016) ("[F]or plaintiff to establish a prima facie violation, therefore, she must show that [the government] discriminated on the basis of sex.")). Mr. Moore further attempts to convince the court that academic commentary, factual differences between his case and the facts in *Yant*, and his own interpretation of the statute make the Federal Circuit's interpretation of 29 U.S.C. § 206(d)(1) inapplicable to the present circumstances. *See* Pl.'s Opp'n at 15-19. However, the court may not ignore binding authority from the Federal Circuit. *See Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1353 (Fed. Cir. 2006) ("There can be no question that the Court of Federal Claims is required to follow the precedent of the Supreme Court, our court [the Federal Circuit], and our predecessor court, the Court of Claims.").

[4] The salient events occurred in 2014, seven years ago, and were sought to be reopened by Mr. Moore in 2016, five years ago. The statute of limitations for claims under the Equal Pay Act is two years, extended to three for willful violations. *See* 29 U.S.C. § 255(a). The parties secondarily argue whether Mr. Moore's claim is too late, but the court finds it unnecessary to reach that aspect of the case for decision.

## CONCLUSION

Because Mr. Moore has not made a *prima facie* case of sex-based discrimination in pay, the court GRANTS the government's motion to dismiss plaintiff's complaint.

The Clerk shall enter judgment in accord with this disposition.

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge

# In the United States Court of Federal Claims

**Nos. 21-1931C**
**(Filed: January 27, 2022)**

**TIMOTHY MOORE**

**Plaintiff**

**v**

**JUDGMENT**

**THE UNITED STATES**

**Defendant**

Pursuant to the court's Opinion And Order, filed January 27, 2022, granting defendant's motion to dismiss,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff's complaint is dismissed. No costs.

Lisa L. Reyes
Clerk of Court

By: s/Anthony Curry

Deputy Clerk

NOTE: As to appeal to the United States Court of Appeals for the Federal Circuit, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $505.00.

APPEAL,CLOSED,ECF

# US Court of Federal Claims
# United States Court of Federal Claims (COFC)
# CIVIL DOCKET FOR CASE #: 1:21-cv-01931-CFL
# Internal Use Only

MOORE v. USA
Assigned to: Senior Judge Charles F. Lettow
Demand: $10,000
Cause: 28:1491 Tucker Act

Date Filed: 09/30/2021
Date Terminated: 01/27/2022
Jury Demand: None
Nature of Suit: 312 Civilian Pay - Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**TIMOTHY MOORE**

represented by **Peter B. Broida**
Peter B. Broida
1840 Wilson Blvd
Suite 203
Arlington, VA 22201
703-841-1112
Fax: 703-841-1006
Email: peterbroida@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**USA**

represented by **Rafique Anderson**
U.S. Department of Justice - Civil Division (G)
Post Office Box 480
Ben Franklin Station
Washington, DC 20044
202-305-3274
Email: rafique.anderson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/30/2021 | 1 | COMPLAINT against USA (SEC) (Filing fee $402, Receipt number AUSFCC-7375592) (Copy Served Electronically on Department of Justice), filed by TIMOTHY MOORE. **Answer due by 11/29/2021.** (Attachments: # 1 |

| | | |
|---|---|---|
| | | Civil Cover Sheet)(tb) (Entered: 09/30/2021) |
| 09/30/2021 | 2 | Notice of Random Assignment Pursuant to Rule 40.1(a) to Judge Charles F. Lettow. (tb) (Entered: 09/30/2021) |
| 09/30/2021 | 3 | NOTICE of Designation of Electronic Case. (tb) (Entered: 09/30/2021) |
| 10/10/2021 | 4 | NOTICE of Appearance by Rafique Anderson for USA . (Anderson, Rafique) (Entered: 10/10/2021) |
| 11/29/2021 | 5 | MOTION to Dismiss pursuant to Rule 12(b)(6) , filed by USA.**Response due by 12/27/2021.** (Attachments: # 1 Appendix)(Anderson, Rafique) (Entered: 11/29/2021) |
| 12/17/2021 | 6 | MEMORANDUM, filed by TIMOTHY MOORE. (Attachments: # 1 Appendix Appendix in Support of Plaintiff's Opposition to Motion to Dismiss)(Broida, Peter) (Entered: 12/17/2021) |
| 12/17/2021 | 7 | ****RE-DOCKETED 6 TO CORRECT FILING ERROR**** RESPONSE to 5 MOTION to Dismiss pursuant to Rule 12(b)(6) , filed by TIMOTHY MOORE. **Reply due by 1/3/2022.** (Attachments: # 1 Appendix (Appendix in Support of Plaintiff's Opposition to Motion to Dismiss)) Service: 12/17/21.(tb) (Entered: 12/17/2021) |
| 12/22/2021 | 8 | Unopposed MOTION for Extension of Time until 1/14/2022 to , filed by USA.**Response due by 1/5/2022.**(Anderson, Rafique) (Entered: 12/22/2021) |
| 12/23/2021 | 9 | ORDER granting 8 Motion for Extension of Time. **Defendant's reply brief due by 1/14/2022.** Signed by Senior Judge Charles F. Lettow. (ac) (Entered: 12/23/2021) |
| 01/14/2022 | 10 | REPLY to Response to Motion re 5 MOTION to Dismiss pursuant to Rule 12(b)(6) , filed by USA. (Anderson, Rafique) (Entered: 01/14/2022) |
| 01/27/2022 | 11 | REPORTED OPINION granting 5 Motion to Dismiss - Rule 12(b)(6).The Clerk is directed to enter judgment. Signed by Senior Judge Charles F. Lettow. (ac) (Entered: 01/27/2022) |
| 01/27/2022 | 12 | JUDGMENT entered, pursuant to Rule 58, that plaintiff's complaint is dismissed. No costs. (Service on parties made.) (ac7) (Entered: 01/27/2022) |
| 02/14/2022 | 13 | NOTICE OF APPEAL as to 12 Judgment, 11 Order on Motion to Dismiss - Rule 12(b)(6), Reported Opinion, filed by TIMOTHY MOORE. Filing fee $ 505, receipt number AUSFCC-7675858. Copy to CAFC. (Broida, Peter) (Entered: 02/14/2022) |

September 2014

# Pay Transition Update

## MEMORANDUM

To: All SEC Employees

From: Lacey Dingman, Chief Human Capital Officer

Date: September 22, 2014

Subject: Pay Transition Update

On Aug. 28, 2014, the SEC and National Treasury Employees Union (NTEU) announced that they signed a comprehensive compensation, benefits, and performance management agreement for bargaining unit employees. The agreement includes a pay transition period during which eligible employees may apply to have their salary reviewed.

Using the SEC's current onboarding pay-setting process, which takes into account an eligible employee's education and years of relevant/specialized experience, the Office of Human Resources (OHR) will review all applications and recommend an appropriate salary based on the appropriate "pay matrix." The application will then be forwarded for review to a "pay transition committee" comprised of an equal number of SEC senior managers and NTEU representatives. The committee will transmit a final salary recommendation to the SEC's chief human capital officer for a decision.

***Eligibility***

All SK employees may submit an application. SK employees are eligible for pay transition if the employee:

- Has not been formally disciplined within the last year;
- Has not received an "unacceptable" summary rating on the employee's most recent or FY 2013 annual performance rating;
- Is not currently on a performance improvement plan; or
- Has not previously had their pay set using the pay matrix. *(If an employee is unsure if their pay was set using the pay matrix or wishes to seek reconsideration, the employee should apply to have his or her salary reviewed).*

***Application Process***

SEC employees may submit an application during the pay transition process period, which is open from Sep. 22 through Oct. 10, 2014.

- Complete work history (including current SEC experience)
- Job Titles
- Duties for each job (be specific in describing the duties)
- Start and end dates for each job, including month and year
- Full-time or part-time status (include hours worked per week if part-time)

See an **example here**.

***Implementing Pay Increases***

The SEC's goal is to complete the pay transition process by the end of 2014. Employees whose approved new salary is **5% or greater than their current salary** will be eligible to receive a pay increase. ***Note:*** *There is an overall budget for pay transition. If this amount is exceeded, employees will be paid a prorated share of the overall budget.*

If you have any questions regarding pay transition, please contact the **Pay Transition team.**

/whats_happening/at_the_sec/september_2014/pay_transition-09222014.html

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

OFFICE OF
INSPECTOR GENERAL

January 27, 2016

# MEMORANDUM

TO: Jeffery Heslop, Chief Operating Officer
Lacey Dingman, Chief Human Capital Officer

FROM: Carl W. Hoecker, Inspector General

SUBJECT: Review of the SEC's Pay Transition Program, 15-ONR-0281-R

The U.S. Securities and Exchange Commission (SEC) Office of Inspector General (OIG) Office of Oversight and Review has completed a review of the SEC's pay transition program (Pay Transition). This memorandum summarizes the results of our review.

## Introduction and Summary

On December 23, 2014, the OIG received an anonymous Hotline complaint about the implementation and unexpected high cost of Pay Transition. Pay Transition is a program resulting from an agreement between SEC management and the National Treasury Employees Union (Union or NTEU), whereby eligible SEC employees could apply to have their pay reviewed, and possibly adjusted, under the pay matrices the SEC adopted in 2012 to set pay for incoming employees.

The anonymous complaint raised the following three main areas of concern:

- First, the complaint questioned the way the Office of Human Resources (OHR) was implementing Pay Transition, particularly how the OHR was calculating employee experience levels, which determined the amount an employee should be paid. The complaint listed several examples of employees from one regional office who were allegedly credited with more years of experience than was appropriate. The complaint also stated that the OHR "disregarded whether the employees have advanced degrees and professional certifications."

- Second, the complaint questioned an eligibility provision in the Pay Transition Agreement, which required that an employee's approved new salary be 5% or greater than the employee's current salary for the employee to qualify for a salary increase. The complaint suggested that the 5% threshold should be increased to 20% to save resources. The complaint also gave an example of one regional office employee who "didn't make the cut because he was at 4.7% while another employee who was at 5.1% was given the entire underpaid amount instead of just the difference of 5% and 5.1%."

- Third, the complaint predicted that Pay Transition would cost the SEC $20 million instead of the budgeted $3 million and questioned where the money was coming from.

During its review, the OIG received four additional complaints regarding Pay Transition. One of those complaints questioned why the OHR had not disclosed to SEC staff that the $3 million cap was being raised; this complaint suggested that the OHR should have reopened the application open season when the additional funds were added. The complaint also asked whether the OHR vetted the resumes that were submitted with the applications. The remaining complaints alleged that (1) all or nearly all SEC employees received salary increases ranging from $20,000 to $40,000, and (2) these salary increases were unwarranted and were instituted with "very little consideration about the financial impact to the agency."[1]

We performed a review of Pay Transition based on the allegations in the complaints. As discussed in more detail below, we learned that the OHR implemented Pay Transition consistent with an agreement between the NTEU and SEC management, including using agreed-upon pay-setting matrices, following a multilayer application review process that included a provision for third party arbitration, and applying an agreed-upon 5% threshold. In addition, we confirmed that the $3 million budget that the NTEU and SEC management initially agreed to for the salary adjustments was significantly lower than the actual amount of the approved salary adjustments. The actual approved salary adjustments amounted to about $21 million per year, which the SEC Chair decided to fully fund. The OHR informed us that the $3 million cap that was included in the Pay Transition agreement with the NTEU resulted from consultations with SEC senior management. We also learned that the budgeted amount reflected the SEC's inability to predict how many people would apply and qualify for Pay Transition.

The OHR further informed us that it did not announce the increased Pay Transition budget to the staff because the OHR typically does not announce budgets for its programs. The OHR also informed us that it had extended the open season for Pay Transition by 4 days for all employees, which the OHR had announced to the staff. Furthermore, according to the OHR, about 10 employees were allowed to apply for Pay Transition after the open season deadline because those employees were either on maternity leave or sick leave during the entire open season. Those employees were added to the applicant pool in November or December 2014, and their applications were processed in a similar manner as those of other applicants.

[1] After we completed our review work and were finalizing this memorandum, the OIG received an additional complaint about Pay Transition and the SEC's pay-setting system more generally. The complaint raised some specific concerns related to Pay Transition that are included in this review. Other concerns expressed in the complaint about the SEC's pay-setting system raised matters that are either beyond the scope of this review or that fall within the purview of other agencies.

## Background

Before 2002, SEC staff were paid according to the General Schedule. In 2002, when the SEC was experiencing high staff turn-over, the Investors and Capital Markets Relief Act (P.L. 107-123) allowed the SEC to create its own compensation system, similar to the systems of other Federal financial regulators.[2] As a result of the legislation, also known as the "Pay Parity Act," the SEC transitioned away from the General Schedule and instituted a compensation system consisting of 17 pay grades. The objective of the pay provisions of the Pay Parity Act was to allow the SEC to provide compensation and benefits at levels comparable with those provided by other Federal financial regulatory agencies.

To implement the Pay Parity Act, the SEC established certain goals for its pay parity effort, which included the following: (1) providing comparability with other Federal financial regulatory agencies; (2) reducing supervisory pay compression; (3) accounting for differences among certain specialized occupations; and (4) increasing the agency's reliance on merit and performance-based management principles. According to the SEC, focusing on these goals would substantially improve its effectiveness and efficiency by allowing it to keep staff longer and to provide more incentives for them to extend their tenures by improving the link between pay and performance.[3]

Until 2012, the SEC's new hire pay setting policy was to (1) match current salary, (2) offer up to 6% above current salary with management justification and OHR approval; or (3) offer the maximum rate of pay for the grade.[4] According to the OHR, pay setting was almost exclusively based on an employee's previous salary rather than a valuation of an employee's experience as it relates to a particular job.

In May 2012, based in part on recommendations from outside compensation consultants, the SEC began using a structured pay-setting process for new employees and current employees selected for competitively announced positions. The OHR developed pay matrices that set pay based on a candidate's years of relevant and specialized experience.

According to OHR officials, as the new pay-setting process was being implemented, the OHR received complaints that some SEC employees who were hired before May 2012 would be at a higher salary level if they were newly hired. After negotiations with the NTEU, on August 19, 2014, the SEC and the NTEU executed the *Memorandum of Understanding Between Securities and Exchange Commission and the National Treasury Employees Union* (Agreement). Section 12 of the Agreement, titled "Pay Transition Committees," contains the Pay Transition provisions.

Section 12(A) of the Agreement states that the purpose of Pay Transition is to benefit employees by comparing actual employee salaries to the salaries that employees would receive if they were newly hired based on the SEC's current pay matrices. The Agreement also explains how Pay Transition will be implemented for bargaining unit employees.

---

[2] 5 U.S.C. § 4802(b) and (c) (2012).

[3] March 6, 2002, SEC Pay Parity Implementation Plan and Report.

[4] October 31, 2012, Towers Watson Final Report to the SEC.

Section 12(B) of the Agreement establishes a committee in each division and office that is composed of two members appointed by the NTEU and two members appointed by management.[5] According to Section 12(B), the committees "will address historical practices in setting initial salaries of employees with similar qualifications and experience."

Under Section 12(D-E) of the Agreement, eligible applicants[6] may submit an application with an updated resume to the OHR during a 15-day open season. Under Section 12(F) of the Agreement, the OHR then performs an initial analysis, makes a pay-setting recommendation, and forwards the application to a committee for review.

Under Section 12(G) of the Agreement, the appropriate committee reviews the applications and, using pay-setting matrices, determines whether the applicants meet the criteria for a pay adjustment and, if so, the amount of that adjustment.

The pay-setting matrices, which are discussed in Section 12(C) and are attached to the Agreement, "consider an applicant's relevant education, relevant years of experience, relevant years of specialized experience, and relevant credentials and/or licensing."[7] The pay matrices set out the following definitions: (1) "Specialized" experience is "[p]rior technical experience that equips a candidate with the skill and knowledge to successfully perform the duties of a position and is directly related to the duties of the position to be filled;"[8] and (2) "Relevant" experience "[i]ncludes prior experience not directly related to the duties of the position but which nonetheless prepares the candidate for success in the position." Each pay level has several base pay levels that are associated with a range of years of both relevant and specialized experience.

Under Section 12(H-J) of the Agreement, after the committee makes its pay-setting recommendation, the Chief Human Capital Officer (CHCO), in consultation with the applicant's division or office, provides the final review of all committee recommendations to ensure each applicant's education, years of experience, years of specialized experience, and relevant credentials/licensing meet the relevant criteria. The CHCO makes a decision on each pay adjustment, but only approves those pay adjustments to base salary that are equal to or in excess of 5% of the employee's current base salary. The CHCO also has the discretion to return any recommendation to the committee for a one-time reconsideration.

---

[5] Divisions and offices with fewer than 30 bargaining unit employees are reviewed by a joint "at-large" type committee with two members appointed by the NTEU and two members appointed by management.

[6] Under Section 12(E) of the Agreement, applicants are not eligible for a pay adjustment if they: (1) have been disciplined in the last year or are currently on a Performance Improvement Plan; (2) received an "unacceptable" performance rating; (3) entered on duty after May 31, 2012, or have had a salary modification under the pay matrix; or (4) are determined by the committee to be eligible for a salary adjustment of less than 5% of their current base salary.

[7] The term "relevant" means relating to the employee's current position.

[8] The term "directly related" is defined in the pay matrices as "connected to the duties of the position (for example, for a SK-0905-14 General Attorney in the Division of Enforcement, prior experience is directly related if the employee was working as an attorney and conducting investigations, engaging in discovery, taking depositions or testimony, working on securities law matters, or performing duties required for the SK-14 General Attorney position)."

Under Section 12(M-N) of the Agreement, the parties agree to hire and use a third-party neutral arbitrator to decide appeals in cases where the CHCO adopts a recommendation that was not supported by at least one NTEU committee member. The arbitrator's decision is final, binding, and not appealable.

Section 12(O) of the Agreement includes a budget of $3 million to cover all salary adjustments for bargaining unit employees. Under Section 12(P), if the SEC determines that it has insufficient funds to pay all the approved salary adjustments, the Chair or her designee may declare a "budgetary shortfall," and the SEC will pay each qualifying employee a proportionate share of the $3 million. Under Section 12(Q), pay adjustments are not retroactive; thus, an employee approved for an adjustment is assigned a new salary that is prospective only.

After the Agreement was approved, the Chair extended Pay Transition to non-bargaining unit employees with a budget of $750,000. Pay Transition for non-bargaining unit employees was essentially the same as for bargaining unit employees, except that non-bargaining unit employees did not have arbitration rights and the committees reviewing non-bargaining unit employees' applications included only representatives from management.[9]

The SEC published three notices to the staff regarding Pay Transition as follows:

- On August 28, 2014, the SEC and the NTEU announced the Agreement to the staff. The announcement included a Question and Answer section on Pay Transition describing the program and how to apply, and alerting employees that an application "open season" would be announced in the near future and would last 15 working days.

- On September 22, 2014, the SEC announced to the staff that the Pay Transition open season had begun and would run from September 22, 2014, to October 10, 2014. The notice included an explanation of the application process and a sample application.

- On October 9, 2014, the OHR notified SEC staff that the Pay Transition open season would be extended to October 14, 2014. The notice linked to a set of Frequently Asked Questions for Pay Transition and invited staff to submit further questions to the Pay Transition Mailbox.

On August 20, 2015, the OHR informed us of the following:

- 1,622 SEC employees applied for Pay Transition—1,271 bargaining unit employees and 351 non-bargaining unit employees. A total of 1,054

[9] According to the OHR, there was no written document applying Pay Transition to non-bargaining unit employees. However, pursuant to its standard practice of extending negotiated programs to all employees, the SEC applied Pay Transition to both bargaining unit and non-bargaining unit employees.

employees—842 bargaining unit employees and 212 non-bargaining unit employees—received salary increases (about 65% of the applicants).

- The CHCO reviewed all Pay Transition applications and the CHCO's pay-setting decision for bargaining unit employees was less than the committee's recommendation in 72 instances (about 9%); her decision for non-bargaining unit employees was less than the committee's recommendation in 32 instances (about 15%).

On October 30, 2015, the CHCO informed us that the NTEU and the OHR had resolved all Pay Transition applications and that the program had concluded in October 2015 without arbitration.[10] Pay Transition took effect for all approved applicants as of June 14, 2015.

## Scope and Methodology

During this review, we interviewed the CHCO, the Deputy CHCO, an OHR Assistant Director, an OHR Branch Chief, and the SEC's Chief Financial Officer (CFO). We also reviewed relevant documents, including the Agreement with the NTEU that established Pay Transition, the OHR's announcements to SEC staff about Pay Transition, and the committee member training slides for Pay Transition. We focused our review on the Pay Transition Agreement and the process used to implement the Agreement. We did not review any Pay Transition applications or assess any decisions made on those applications.[11]

## Results of the Review

### A. Pay Transition Implementation

OHR officials informed us that Pay Transition was the product of significant negotiations, over a 2-year period, between SEC management and the Union. Based upon several employee complaints, the SEC and the Union agreed that some SEC staff were earning less than they would if their salaries had been calculated using the new pay matrices. Before May 2012, the OHR determined pay for new employees primarily based on prior salary. In May 2012, the OHR switched to its current policy of determining pay based on prior experience.

In an interview with us, OHR officials described the process used to evaluate Pay Transition applications, which OHR officials said was consistent with the process detailed in the Agreement, as follows. The OHR initially reviewed all the applications and made an initial pay determination, using the same process the OHR uses for new employees. Under the guidance of an OHR Branch

[10] According to the OHR, seven non-bargaining unit employees filed grievances related to Pay Transition under SECR 6-25, *SEC Administrative Grievance Procedures* (March 2, 2012). Of those, three grievances were informally resolved and the remaining four were denied (by the Chief Operating Officer in three instances and by the CHCO in one instance where the employee did not request reconsideration by the Chief Operating Officer).

[11] Because we did not perform an audit or evaluation of Pay Transition, we did not follow the Government Auditing Standards or the Council of the Inspectors General on Integrity and Efficiency's Quality Standards for Inspections and Evaluations in conducting this review.

Chief, contractors specifically hired for the Pay Transition Program reviewed the applications. The OHR calculated an applicant's years of relevant and specialized experience, and then determined a salary based on the applicable pay matrices.

According to OHR officials, a significant part of the prior experience determination required the OHR to decide whether an employee's prior experience was "specialized" or "relevant." The OHR noted that specific definitions for the terms "specialized" and "relevant" were included in the pay matrices and were agreed to by the NTEU.

When asked whether the OHR vetted the resumes submitted with the Pay Transition applications, the CHCO said that the OHR treated the resumes the same way the OHR treats resumes from outside applicants, that is, by requiring an attestation of truthfulness. The CHCO further stated that the OHR was not aware of any allegation that resumes submitted for Pay Transition were falsified or embellished. In addition, she said the committee members who reviewed the applicants' resumes were the applicants' peers and managers and would, therefore, likely have detected any discrepancies.

OHR officials also stated that, once the OHR completed its review, all applications (except for a couple, where the employees were disqualified based on disciplinary actions) were referred to committees for review. The committees were divided by each division and office, with separate regional office committees further established at the program level (for example, Division of Enforcement and Office of Compliance Inspections and Examinations). At headquarters, any small offices were grouped together into an "at large" committee.

OHR officials stated that, consistent with the Agreement, each committee included two managers and two Union representatives. Each committee had an alternate member who could step in if a committee member needed to recuse himself or herself because of a conflict, such as if the committee member had applied for Pay Transition and his or her application was under review. OHR officials stated that all committee members attended training during which they were advised of privacy and recusal issues.

According to OHR officials, the committee members were tasked with reviewing each application and making a determination on experience level and pay using the pay matrices. The committees could disagree with the OHR on the number of years of relevant and specialized experience to assign to an applicant and make a different pay recommendation. OHR officials stated that, for the most part, the committees agreed with the OHR's salary calculations. After the committees made their determinations, the applications were forwarded to the CHCO. The CHCO was tasked with resolving any discrepancies between the OHR's determination and the committees' recommendations, subject to arbitration as set forth in the Agreement.

According to OHR officials, the process used for non-bargaining unit employee applications was similar to that used for bargaining unit employee applications, except that committees composed entirely of managers reviewed the non-bargaining unit employee applications and non-bargaining unit employees had no arbitration rights.

OHR officials also stated that the OHR created a SharePoint site to maintain all the information related to the Pay Transition applications. Access to the site was limited (that is, committee members could only see the applications on which they were working), and each step of the process was locked so once information was entered, only a system administrator could change it. The OHR stated that it had double-checked all the Pay Transition calculations and that the CHCO had also personally checked the calculations.

The CHCO informed us that she personally reviewed all the Pay Transition applications. She stated that in most instances, she found that the Union and management committee members had agreed with each other's recommendations. She also stated that she disagreed with some committee decisions that rounded up years of experience and with some committee decisions on whether certain experience was "specialized" or merely "relevant." The CHCO explained that the OHR took the position that, for applicants in attorney positions, work experience gained before the applicant earned a law degree could be considered relevant, but not specialized, experience. The CHCO said there was one exception to this rule that the Chair initiated: an employee's pre-law degree SEC experience could be considered specialized experience.[12]

On October 30, 2015, the CHCO informed us that the OHR and the NTEU had resolved all outstanding Pay Transition applications without arbitration (*see also* footnote 5, *supra*). Pay Transition was concluded in October 2015, with all Pay Transition salary adjustments made effective as of the pay period beginning June 14, 2015.[13]

### B. The 5% Eligibility Provision

Section 12(E) of the Agreement included the following language: "Applicants will not be eligible for pay adjustment if the applicant ... is determined by the Committee to be eligible for a pay adjustment of less than 5% of the employee's current base salary." OHR officials explained that Pay Transition was the recommendation of outside compensation consultants, who anticipated that it would apply only to a very limited pool of employees who had the most significant pay disparities. Accordingly, OHR officials stated that during the negotiations with the Union, the OHR advocated for an individual eligibility limit of about 20%, whereas the Union advocated for no eligibility limit. The 5% eligibility limit was the compromise reached with the Union.

OHR officials stated that the OHR received some complaints from applicants who were below the 5% threshold. The CHCO stated that the OHR was not making any exceptions to the 5% rule, which is expressly stated in the Agreement, noting that there would be complaints wherever the line was drawn for receiving a Pay Transition salary increase.

---

[12] Under this exception, if an SEC attorney had worked at the SEC prior to attending law school, that prior SEC experience could be considered specialized experience.

[13] For applicants approved for a salary adjustment prior to June 14, 2015, their pay adjustment began in pay period 14. For applicants approved after June 14, 2015 (those that required further review and negotiations with the NTEU), their pay adjustment began in a subsequent pay period but was retroactive to June 14, 2015.

### C. Pay Transition Budget

OHR officials stated that the initial $3 million budget was developed in consultation with several senior SEC officials. The budget was based on a preliminary assessment of the anticipated costs of the program that was conducted by outside compensation consultants. OHR officials further stated that the cost of Pay Transition was "a significant concern" because the total liability would be based on a number of unknown variables (including the number of applicants and the experience listed in each applicant's resume). OHR officials explained that these unknown factors made it impossible to calculate, and difficult to approximate, the total cost of Pay Transition. According to OHR officials, the $3 million figure was a cap suggested by SEC management to provide budgetary certainty and was negotiated with, and ultimately agreed to, by the NTEU.

The CFO informed us that he was involved with Pay Transition as an advisor from the beginning. The CFO stated that he was involved because he is both the SEC's CFO and a member of the Human Capital Advisory Council.[14]

The CFO stated that he believes that $3 million was the OHR's initial estimate of how much the program would cost. He stated that the Office of Financial Management did not perform any financial modeling for Pay Transition. The CFO also stated that he had relied on the OHR's estimates in initially including $3 million for Pay Transition in the SEC's fiscal year (FY) 2015 budget. He also said that in December 2014 or January 2015, he learned from the OHR that there was more demand for Pay Transition than first anticipated, and he later learned that the program would cost $21 million.[15] He said the Chair made the decision to fully fund Pay Transition and that he agreed with the Chair's decision, which he characterized as "a matter of fairness."

The CFO stated that the new salaries under Pay Transition would start in June 2015, which is two-thirds of the way into FY 2015. Therefore, he added $7 million to the FY 2015 compensation budget to cover the salary increases. According to the CFO, the Pay Transition cost for FY 2016 will be about $21 million (or about 2.1% of the SEC's compensation budget). The CFO also said that he did not believe it was originally anticipated that the Pay Transition cost would reach $21 million, as the original vision was to correct only gross disparities in pay and that the $3 million cap was developed in line with this original vision.

According to OHR officials, the Chair decided to fully fund Pay Transition on May 20, 2015, 7 months after the open season deadline for submitting applications. OHR officials stated that the Deputy CHCO notified the NTEU's President of the Chair's decision that same day. The CHCO stated that the OHR did not announce the Chair's decision to the SEC staff because the OHR typically does not announce the budget for its programs.

According to the CHCO, the budget for Pay Transition should not have impacted any employee's decision to apply for a salary increase because about 1,600 employees applied and, at

[14] The Human Capital Advisory Council is a group of representatives from various divisions and offices that meets once a month to discuss upcoming human capital initiatives and programs, and to provide feedback to the OHR on human capital questions.

[15] The $21 million figure includes salary adjustments for both bargaining unit and non-bargaining unit employees.

the time of the open season, it was unknown (1) how many employees would apply, or (2) how much the program would cost. OHR officials also informed us that the OHR extended the open season for Pay Transition by 4 days for all employees, and about 10 employees were allowed to apply for Pay Transition after the open season deadline because those employees were either on maternity leave or sick leave during the entire open season. Those employees were added to the applicant pool in November or December 2014 and their applications were processed in a similar manner as those of other applicants.

The CHCO also stated that the SEC is not considering reopening Pay Transition and that the Union has not asked for it to be reopened. The CHCO further said that the OHR considers Pay Transition a one-time program that would not be offered again because it took a significant amount of time and resources to implement.

## Conclusion

Based on the results of our review, we learned that the process the OHR used to implement Pay Transition was consistent with the Agreement, including application of the agreed-upon pay-setting matrices and use of a multi-level application review process. We also learned that the 5% eligibility provision contained in the Agreement was the result of a compromise between OHR officials and the Union.

In addition, we confirmed that the $3 million budget set forth in the Agreement to cover the Pay Transition salary adjustments was significantly lower than the actual amount of the approved salary adjustments. The actual salary adjustments amounted to about $21 million, which the Chair decided to fully fund. We learned that the difference was the result of the SEC's inability to predict how many people would apply and qualify for Pay Transition, and the total amount of all approved pay adjustments.

We also learned that Pay Transition was completed in October 2015, with no party invoking arbitration (*see also* footnote 9, *supra*), and all salary adjustments were effective as of June 14, 2015.

The OIG is issuing this memorandum to management for informational purposes and is not making any recommendations. We previously provided SEC management with a draft of this memorandum for technical comments and incorporated those comments into the final memorandum as appropriate.

cc: Mary Jo White, Chair
Andrew J. Donohue, Chief of Staff, Office of the Chair
Michael Liftik, Deputy Chief of Staff, Office of the Chair
Nathaniel Stankard, Deputy Chief of Staff, Office of the Chair
Michael S. Piwowar, Commissioner
Jaime Klima, Counsel, Office of Commissioner Piwowar
Kara M. Stein, Commissioner
Robert Peak, Advisor to the Commissioner, Office of Commissioner Stein
Kenneth A. Johnson, Chief Financial Officer, Office of Financial Management
Anne K. Small, General Counsel

Jeff Rosenblum, Deputy General Counsel for General Law and Management
Timothy Henseler, Director, Office of Legislative and Intergovernmental Affairs
John J. Nester, Director, Office of Public Affairs
Darlene L. Pryor, Management and Program Analyst, Office of the Chief Operating Officer

OCIE

MOORE, TIMOTHY G

U.S. Securities and Exchange Commission
# Performance Work Plan

☐ Entire Appraisal Period
☐ Detail (From: ______ To: ______)
☐ Other (specify): ______

| Employee's Name (Last, First, MI) | Job Series | Pay Grade | Appraisal Period (Month/Year) | |
|---|---|---|---|---|
| Moore, Timothy | Exam Manager | SK-15 | From: 10/01/14 | To: 9/30/15 |

| Position Title | Office/Division | Branch |
|---|---|---|
| Exam Manager | OCIE | Market Oversight |

| Rating Official's Name (Last, First, MI) | Rating Official's Position Title |
|---|---|
| McGee, Helene K | Assistant Director |

## Part 1: Performance Communications

**Performance Planning (to be held within 30 days of the beginning of the performance review cycle)**

*Performance expectations are fully discussed during this meeting. The rating official and employee are expected to reach a "good faith," mutual understanding of the expectations identified in this PWP. The rating official retains ultimate discretion regarding work assignments and expectations.*

| | |
|---|---|
| Employee's Signature (I acknowledge that performance expectations outlined in this PWP have been discussed fully with me.) [signature] | Date 10/30/2014 |
| Rating Official's Signature Helene K. McGee | Date 10/30/14 |

### Interim Review

**Interim Review (attach additional Interim Review Sheets, as required)**

*Interim reviews focus on the employee's performance and accomplishments to date. A minimum of one interim review must be conducted during the performance cycle. The interim review will generally take place halfway through the rating cycle.*

Interim Review Summary:

See Attached

| | |
|---|---|
| Employee's Signature (acknowledging receipt of this feedback) [signature] | Date 5/28/15 |
| Rating Official's Signature Helene K. McGee | Date 5/28/15 |

### Summary Rating

**RATING OFFICIAL'S RECOMMENDED RATING FOLLOWING CALIBRATION MEETING**

| | |
|---|---|
| Rating of Record 4-Exceeds Expectations | |
| Rating Official's Signature Helene K. McGee | Date 12/30/15 |
| Second Level Supervisor's Signature John Palese | Date 01/04/16 |

**PERFORMANCE REVIEW COMMITTEE'S RECOMMENDED RATING**

| | |
|---|---|
| Rating of Record 4 | |
| Committee Official's Signature [signature] | Date 1/11/16 |

**DECIDING OFFICIAL'S RATING OF RECORD DETERMINATION**

| | |
|---|---|
| Rating of Record 4 | |
| Deciding Official's Signature [signature] | Date 1/11/16 |

Employee's Last Name: Moore

## *Part 2: Performance Objectives*

*Performance is appraised in light of what is reasonably achievable given the employee's experience level, the complexity of assignments, and factors within the employee's control. Please refer to PWP Instructions for further details on rating scales.*

**Performance Objectives must be aligned with relevant goals from the SEC Strategic Plan. Please select the most applicable goal for your Office/Division:**

X Goal 1: Foster and enforce compliance with the federal securities laws
☐ Goal 2: Establish an effective regulatory environment
☐ Goal 3: Facilitate access to the information investors need to make informed investment decisions
☐ Goal 4: Enhance the Commission's performance through effective alignment and management of human, information, and financial capital

**Objective #1:**

***Program Management:***
Effectively manages the planning, staffing, scheduling, and execution of assigned examinations consistent with OCIE policies and Office objectives, including by providing examiners with useful and timely guidance, promptly identifying and addressing issues with individual examiners and exam teams, and by communicating to and consulting with senior managers as appropriate;

Leads branch effectively by setting a positive and professional tone and example for examiners, motivating them to fulfill SEC's mission by accomplishing OCIE's and the Office's goals and objectives, and by effectively implementing guidance and direction of senior management; and

Promotes and maintains an environment of cooperation and creates a high level of team cohesion by empowering examiners, working with other branches, sharing relevant information within and across branches and with senior managers, and seeking to develop and utilize the contributions of all examiners.

**Supervisor Comments:**

During the evaluation period, Mr. Moore managed the planning, staffing, and execution of a number of inspections and other assignments. For example, he was the exam manager for the 2015 Section 31 inspections of eleven SROs and was responsible for closing out the 2014 Section 31 inspections. In addition, he was the exam manager in charge of the FINRA Fixed Income inspection. He also finalized the information memorandum to the Commission for the Market Participation (Critical Mass) sweep and coordinated the review of the production for the MIAX Equities pre-launch. In addition, he continued to serve as the exam manager in charge of TCRs and conducted a number of individual TCR reviews. Finally, Mr. Moore served as the coordinator for OCIE and deputy campaign manager for the SEC for the 2014 Combined Federal Campaign. In the 2015 Section 31 inspections, he guided an exam team of ten staff members in reviewing the policies, procedures, and practices of eleven SROs for compliance with Section 31. He provided the exam team with effective guidance. In this regard, he set deadlines for the exam team, monitored how staff were performing, and offered helpful guidance to team members on completing their reviews. All eleven inspections were completed in a timely manner as a result of his efforts. In the FINRA Fixed Income inspection, he worked well with the exam team and his supervisor, by updating his supervisor on the status of the inspection, holding weekly staff meetings to keep the exam team on track, and thoroughly reviewing the production from FINRA. As the OCIE CFC coordinator, Mr. Moore had additional significant responsibilities during the evaluation period. For example, he was responsible for coordinating OCIE CFC keyworkers, managing the processing of OCIE CFC donations, handling publicity, and arranging CFC events.

**Rating: (click here for the rating scale descriptions for the performance objectives)**

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ |



Employee's Last Name: Moore

**Objective #2**

***Risk Based Analysis:***
Appropriately and timely evaluates and adjusts scope and methodology of exams in response to new information, priorities, and guidance gleaned from relevant sources so that risk factors are fully analyzed and addressed;

Properly and consistently addresses risk factors when communicating significant findings, emerging issues, and industry trends to senior managers, and in reporting to Enforcement, SROs, and other regulators matters meriting their attention; and

Contributes to planning of exams and sweeps by suggesting targets and issues based on assessments of registrants, industry trends, and regulatory developments.

**Supervisor Comments:**

During the evaluation period, Mr. Moore evaluated and adjusted as appropriate, the scope and methodology of exams in response to information, guidance, and priorities so that risk factors were analyzed and addressed. For example, in the Section 31 inspections, using his expertise and institutional knowledge regarding Section 31, he recommended a new risk-based approach for conducting the 2015 inspections. In this regard, rather than using just the dollar volume of covered sale transactions as had been done in inspections over the past several years, Mr. Moore recommended that the exam team utilize additional risk factors in choosing which SROs to include in the scope of the inspections. He recommended that the team consider not only the total dollar volume of covered sales, but also the length of time since the last Section 31 inspection, risks identified during previous Section 31 inspections, recent changes to systems or key personnel at the SROs, and any TCRs related to Section 31. In the FINRA Fixed Income inspection, he also considered new ways for the exam team to review and explain perceived problems in FINRA's fixed income surveillance procedures.

**Rating: (click here for the rating scale descriptions for the performance objectives)**

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ |

**Objective #3**

***Communication and Coordination:***
Ensures that written work product, both that of the Branch Chief and that of his or her branch (and including deficiency letters and other correspondence, electronic database entries, work papers, and examination reports) has been timely completed, complies with OCIE and Office guidance and policies, and is well organized, clear and concise, substantively complete, factually accurate, and grammatically correct;

Timely reviews planning memos, exam and inspection reports, deficiency letters, and other written work product to ensure that examiners have followed relevant guidance and standards, performed meaningful and relevant analyses, have exercised sound judgment in making scope and testing decisions and reaching conclusions, accurately cited proper sources of legal and regulatory authority, and can reliably document findings of deficiencies and weaknesses;

Cooperates within and across branches and other parts of the Office to share resources and better accomplish branch, Office, and SEC objectives;

Keeps registrants appropriately and timely apprised of developments in examinations and follows up, as necessary, with registrants regarding examination questions or deficiencies; and

Effectively coordinates with other offices and divisions, as necessary, to resolve examination issues and incorporate appropriate feedback into work product and provide other divisions and offices with technical and examination expertise.

**Supervisor Comments:**

During the evaluation period, Mr. Moore communicated and coordinated with exam team members, his supervisors, as well as staff from other Divisions and Offices on a number of projects. For example, on the Section 31 Inspections, managing a large exam team, he reviewed and edited a significant number of reports to ensure the reports were consistent, accurate, and timely submitted to the Commission for review. He also coordinated and received input on the inspections from a significant number of other Divisions and Offices including Trading and Markets, the SEC's Office of Financial Management, DERA, and OCIE's TCP group. In addition, he held conference calls and exit interviews with all the SROs. In the Market Participation/Critical Mass sweep, he reviewed and edited the final information memorandum to the Commission. On the FINRA Fixed Income Inspection, he received input and coordinated with DERA and the Office of Municipal Securities on FINRA's production. In his role as TCR administrator, Mr. Moore managed the Market Oversight POCs and also coordinated with the OCIE TCR POCs to ensure that appropriate Market Oversight staff had access to the SEC TCR system. In addition, as the OCIE CFC coordinator and deputy SEC campaign manager, Mr. Moore collaborated with not only the OCIE keyworkers, but also the coordinators for all the other SEC Divisions and Offices to ensure a successful 2014 CFC campaign.

**Rating: (click here for the rating scale descriptions for the performance objectives)**

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ |

**Objective #4**

***Expert Advice:***

Effectively and timely advises and consults with senior managers regarding new information and potential risk factors identified during exams and other assigned projects, material issues with individual examiners or teams, and market events;

Effectively uses technical and other expertise and resources to enhance examination selection, planning, scoping, testing, and reporting;

Takes initiative to develop and maintain skills and expertise, including by participating on exams, reading Commission releases, industry press, and other relevant sources so as to keep well apprised of developments and changes in the industry generally, at specific registrants, and regarding Commission rules, policies, procedures, and practices; and

Pursues opportunities to contribute to the sharing of information and enhancing of cooperation in forums such as joint and coordinated exams, in inter-regulatory conferences, industry and investor outreach efforts, or examiner training programs.

**Supervisor Comments:**

During the evaluation period, Mr. Moore advised and consulted with his supervisors and colleagues on information and potential risk areas identified during exams and other projects. He also provided guidance, based on his exam experience, on certain projects. For example, in the FINRA Fixed Income inspection, he provided guidance to the exam team on effective practices to review and analyze the substantial production from FINRA and guidance on potential issues with FINRA's fixed income surveillance procedures. In the 2015 Section 31 Inspections, he used his expertise in conducting Section 31 inspections to enhance the exam selection process, by recommending alternative risk-based methods to select which SROs to review for Section 31 compliance. He also provided the exam team with substantial guidance on effectively and timely completing the inspections. With respect to his responsibilities as the exam manager over TCR administration, he provided the TCR administrators with guidance on effective procedures for



Employee's Last Name: Moore

processing Market Oversight TCRs. During the evaluation period, Mr. More also took the initiative to expand his own knowledge and expertise by attending numerous trainings. For example, he attended trainings on the fundamentals of options and derivatives, identifying and analyzing churning, strategies for managing teleworkers, and writing for clarity and impact.

Rating: (click here for the rating scale descriptions for the performance objectives)

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ |

Objective #5

***Resource Management and Development:***
Manages staff and other resources effectively by continually focusing on achieving objectives of the Office while adapting to changing priorities, anticipating obstacles, and effectively handles multiple assignments and responsibilities, including by taking on additional projects without compromising timeliness or quality of work;

Demonstrates consistent diligence, care, and judgment in delegating tasks, making examiner assignments, providing work plans and guidance, establishing examiner expectations on an ongoing basis, coaching and mentoring examiners including with constructive and measurable feedback, and timely and appropriately accomplishing necessary administrative and personnel responsibilities;

Shows creativity, develops and implements new processes and procedures that improve efficiency or effectiveness; and

Contributes to recruiting, motivating, developing, and retaining highly qualified examiners to achieve the long-term goals of the Office and the Commission.

Supervisor Comments:

During the evaluation period, Mr. Moore managed staff and other resources in order to achieve the objectives of the office. As noted, he managed staff on the Section 31, FINRA Fixed Income, MIAX Equities pre-launch, and Market Participation/Critical Mass reviews. In the FINRA Fixed Income Inspection, he managed the team members, some of whom had never reviewed fixed income surveillance before, and offered guidance on FINRA's program and effective methods to review and analyze the substantial production. He held weekly meetings with the team to receive updates on the progress of the exam team's review. In the 2015 Section 31 Inspections, he was able to guide a team of ten staff members, some of whom had never reviewed the substantive area before, efficiently and effectively so that all the inspections were completed in a timely, accurate, and consistent manner. During the evaluation period, he also efficiently managed the Market Oversight TCR administrators. In his role as the OCIE CFC Coordinator and Deputy SEC CFC Coordinator, he regularly provided guidance and feedback to OCIE and other SEC staff members on CFC processes and procedures to ensure a successful fundraising campaign.

Rating: (click here for the rating scale descriptions for the performance objectives)

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ |



Employee's Last Name: Moore

## Part 3: Performance Standards

*Performance is appraised in light of what is reasonably achievable given the employee's experience level, the complexity of assignments, and factors within the employee's control. Please refer to PWP Instructions for further details on rating scales.*

**Standard: Managing Human Resources**

Competency Definition: Plans, distributes, coordinates, and monitors work assignments; evaluates work performance and provides constructive feedback by taking action to address performance problems; ensures staff are appropriately selected and utilized and are treated in a fair and equitable manner regardless of race, gender, age, religion, and other individual differences.

| Unacceptable (1) | Meets Expectations (3) | Greatly Exceeds Expectations (5) |
|---|---|---|
| Fails to regularly monitor, evaluate, or document the performance of work unit members against performance measures to ensure quality and timeliness standards are met; fails to ensure performance distinctions are made among individuals.<br><br>Fails to set clear performance expectations and does not effectively assign, coordinate, or monitor the work of others; fails to provide candid and useful feedback and coaching to improve performance. Fails to consider staff expertise and experience when assigning and monitoring work.<br><br>Does not support or adhere to applicable personnel policies and regulations, including Merit System Principles and EEO policies; does not monitor the work environment and promptly address allegations of discrimination by taking appropriate action.<br><br>Does not address performance and conduct problems in a fair, timely, honest, and respectful manner in accordance with applicable policies and procedures. Fails to appropriately escalate issues.<br><br>Does not identify or effectively advocate for the human resources necessary to support and contribute to mission requirements; fails to effectively carry out recruiting and hiring strategies to attract and retain highly qualified candidates and effectively integrate them into the work unit. | Regularly monitors, evaluates, and documents the performance of work unit members against performance measures to ensure quality and timeliness standards are met; ensures performance distinctions are made among individuals.<br><br>Sets clear performance expectations and effectively assigns, coordinates, and monitors the work of others; provides candid and useful feedback and coaching to improve performance. Considers staff expertise and experience when assigning and monitoring work.<br><br>Actively supports and adheres to all applicable personnel policies and regulations, including Merit System Principles and EEO policies; monitors the work environment and promptly addresses allegations of discrimination, taking appropriate action.<br><br>In accordance with applicable policies and procedures, addresses performance and conduct problems in a fair, timely, and respectful manner. Appropriately escalates issues as needed.<br><br>Identifies and effectively advocates for the human resources necessary to support and contribute to mission requirements; effectively carries out recruiting and hiring strategies to attract and retain highly qualified candidates and integrate them into the work unit. | *Additions at the Greatly Exceeds Expectations level:*<br><br>Uses the performance management system to reinforce and foster superior performance.<br><br>Strives to increase motivation by tailoring methods of reward and recognition to the individual.<br><br>Identifies potential performance problems before they become serious and gives early feedback to eliminate problems. Addresses performance issues in an honest, respectful, candid, and fair manner, while striving to maintain the receiver's motivation.<br><br>Anticipates skill needs that are consistent with organizational trends and changing priorities; identifies developmental opportunities for staff to address these needs.<br><br>Demonstrates excellence in the application of Merit System Principles and EEO policies by proposing innovative methods to achieve those goals; documented actions show that equal access to employment programs and opportunities is a priority.<br><br>Anticipates changes in workload requirements and adapts or advocates for human resources well in advance of when they are needed, resulting in greater productivity. |



Employee's Last Name: Moore

**Supervisor Comments:**

During the evaluation period, Mr. Moore effectively coordinated and monitored staff work assignments, evaluated work performance, and provided staff feedback and guidance. As noted, he managed exam teams on the 2014 and 2015 Section 31, FINRA Fixed Income, MIAX Equities pre-launch, and Market Participation/Critical Mass reviews. In the Section 31 inspections, he coordinated and monitored the staff's work progress and offered guidance so that all the inspections were completed in a timely and effective manner. In the FINRA Fixed Income and MIAX Equities pre-launch reviews, he met with staff to ensure that the exam teams thoroughly and timely analyzed and evaluated the productions from the SROs, including staff members who were having difficulties in timely reviewing the information. In his individual TCR reviews, he worked with the exam team members to review the relevant issues and determine appropriate responses and dispositions for the TCRs. He also oversaw the Market Oversight TCR administrators.

**Rating: (click here for the rating scale descriptions for the performance standards)**

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ |

**Standard: Diversity and Inclusion**

Competency Definition: Champions and promotes a diverse and inclusive work environment in which all employees have an opportunity to be productive by managing, developing, and treating staff equitably regardless of individual differences. Contributes to a culture of respecting and appreciating diversity and the benefits of a diverse workforce through participating in diversity awareness activities.

| Unacceptable (1) | Meets Expectations (3) | Greatly Exceeds Expectations (5) |
|---|---|---|
| Fails to respect cultural, race, gender, and other individual differences in the workforce.<br><br>Fails to participate in the implementation of strategies to retain diverse employees and assimilate them into the work unit.<br><br>Fails to participate in diversity-related efforts (for example, does not speak at diversity events hosted by the SEC or diverse professional and/or community organizations, does not contribute to the development of a high-quality, diverse workforce by supporting and/or participating in the agency's diversity recruiting and hiring efforts. | In accordance with agency diversity and inclusion policies, procedures, and initiatives:<br><br>As appropriate, regularly solicits and acknowledges diverse ideas and points of view of all staff (for example, via regular staff meeting discussions) to gain an understanding of the differing perspectives and priorities of others in the work unit. Considers this information when making decisions. Communicates outcome to staff in a way that demonstrates diverse ideas and viewpoints were considered.<br><br>Encourages staff participation in diversity and inclusion efforts (for example, written communications to staff encouraging and commending participation in diversity-related efforts; adjusting work load demands, as appropriate, to facilitate participation in agency diversity | *Additions at the Greatly Exceeds Expectations level:*<br><br>Participates in the implementation of strategies to retain employees and assimilate them into the work unit.<br><br>When initiating new contracts for goods and services, requests information from, and considers utilizing, minority-owned and women-owned businesses to fulfill the agency's business needs.<br><br>Promotes and/or participates in inclusion and diversity-related efforts. Examples include, but not limited to:<br>--speaks at diversity events hosted by the SEC or by diverse professional and/or community organizations,<br>--contributes to the development of a high-quality, diverse workforce by supporting and/or participating in the agency's diversity recruiting and hiring efforts, etc. |



Employee's Last Name: Moore

| | | |
|---|---|---|
| | and inclusion efforts; etc.). | --recruits at minority-focused colleges and women's colleges, and at job fairs in urban communities; --mentors and facilitates agency internship opportunities for young minorities and women and individuals with disabilities; and, --participates in agency programs targeting high schools in underserved communities to provide mentoring and financial literacy education). |

**Supervisor Comments:**

During the evaluation period, Mr. Moore applied management principles that promoted and fostered a diverse and inclusive work environment. He consistently treated all employees equitably and with respect. He effectively demonstrated these principles in his assigned projects including the Section 31, FINRA Fixed Income, Market Participation/Critical Mass and MIAX pre-launch inspections. Mr. Moore also participated in Market Oversight hiring, in order to recruit and develop a high quality work force. He attended diversity related trainings and events, including performance management training. In addition, he served as the coordinator of OCIE's CFC campaign and deputy manager of the SEC's campaign encouraging staff to participate in diverse charitable giving. His substantial efforts in this regard led to a successful 2014 OCIE CFC campaign.

**Rating: (click here for the rating scale descriptions for the performance standards)**

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☒ | ☐ | ☐ |

**Standard: Workload Management**

Competency Definition: Organizes work, sets priorities, and determines short- or long-term goals and strategies to achieve them; coordinates with stakeholders; monitors progress toward goals and evaluates outcomes. Adapts behavior or work methods in response to new information, changing conditions, or unexpected obstacles; effectively deals with ambiguity. Displays a high level of initiative and commitment towards completing assignments in a timely manner and is independently motivated to achieve results.

| Unacceptable (1) | Meets Expectations (3) | Greatly Exceeds Expectations (5) |
|---|---|---|



Employee's Last Name: Moore

| | | |
|---|---|---|
| Does not plan, organize, or prioritize work to complete assignments in a timely and effective manner; fails to keep others informed of progress and status and escalate issues as appropriate.<br><br>Fails to make adjustments to work priorities and schedules to address emerging issues, changing priorities and/or scope; ineffectively deals with ambiguity.<br><br>Does not coordinate with others to set priorities in support of objectives, complete work, or utilize available resources.<br><br>Fails to demonstrate a willingness to become knowledgeable about new areas in response to changing priorities, strategies, or demands.<br><br>Does not manage obstacles in a manner that minimizes or avoids delays in the delivery of information, products, and services.<br><br>Does not accept responsibility or take ownership of actions and work. | Plans, organizes, and prioritizes work to complete assignments in a timely and effective manner; keeps others informed of progress and status and escalates issues as appropriate.<br><br>Makes adjustments to work priorities and schedules to address emerging issues, changing priorities and/or scope; effectively deals with ambiguity.<br><br>Completes work or projects by coordinating with others to best utilize available resources and set priorities in support of objectives.<br><br>Demonstrates a willingness to become knowledgeable about new areas in response to changing priorities, strategies, or demands.<br><br>Manages obstacles in a manner that minimizes or avoids delays in the delivery of information, products, and services.<br><br>Accepts responsibility and takes ownership of actions and work. | *Additions at the Greatly Exceeds Expectations level:*<br><br>Anticipates and makes adjustments to plans, priorities, and schedules to respond to changing work situations or requirements, even in difficult situations.<br><br>Remains productive and develops contingency plans when responding to competing priorities.<br><br>Takes initiative to interpret emerging issues that affect assignments and adapts products and services as needed.<br><br>Persists in overcoming obstacles to accomplish assignments; rapidly adjusts plans, goals, and priorities to meet deadlines.<br><br>Independently recognizes and adapts to ambiguous and uncertain situations.<br><br>Seeks out new responsibilities, assignments, challenges, and opportunities to contribute, as appropriate.<br><br>Takes action to achieve outcomes and results that exceed requirements for quality, quantity, and/or timeliness. |

**Supervisor Comments:**

As noted, during the evaluation period, Mr. Moore was responsible for a number of inspections and other assignments, including the Section 31 inspections, the FINRA Fixed Income inspection, the MIAX Equities pre-launch review and the Market Participation/Critical Mass sweep. He also served as exam manager overseeing the TCR administrators and reviewed a number of TCRs. In addition, he was the OCIE CFC coordinator and SEC CFC deputy manager. Working with his supervisors and exam team members, he managed these projects by determining priorities and monitoring the progress of work. In the 2015 Section 31 inspections, he managed the exam team through all stages of the project, including pre-inspection, document review, report drafting, and sending the final reports and information memorandum to the Commission for review. In the FINRA Fixed Income inspection, he was able to work effectively with and manage certain obstacles particularly with staff members who were new to the inspection or who had difficulty reviewing extensive documents in a timely manner. During the evaluation period, Mr. Moore was also able fulfill his responsibilities as the coordinator and deputy manager on the CFC campaign without compromising the quality of his substantive work.



Employee's Last Name: Moore

| Rating: (click here for the rating scale descriptions for the performance standards) | | | | |
|---|---|---|---|---|
| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
| ☐ | ☐ | ☐ | ☒ | ☐ |

| Standard: Critical Thinking | | |
|---|---|---|
| Competency Definition: Identifies problems and determines accuracy and relevance of information; uses sound judgment to generate and evaluate alternatives; makes recommendations and applies solutions. Makes sound, well-informed, and objective decisions; perceives the impact and implications of decisions; follows through on decisions and commits to a path to accomplish work goals even in uncertain situations. | | |
| Unacceptable (1) | Meets Expectations (3) | Greatly Exceeds Expectations (5) |
| Fails to identify key issues; does not collect, evaluate, analyze, and integrate data/information to better define problems.<br><br>Does not draw on experience and available resources to propose informed and timely solutions, strategies, and/or procedures to effectively solve problems or issues; fails to appropriately escalate unusual situations.<br><br>Does not consider the consequences or impact of recommendations and/or decisions. | Identifies key issues and collects, evaluates, analyzes, and integrates data/information from appropriate sources to better define problems.<br><br>Draws on experience and appropriately utilizes resources to propose informed and timely solutions, strategies, and/or procedures to effectively solve problems or issues; appropriately escalates unusual situations.<br><br>Considers the consequences or impact of recommendations and/or decisions. | ***Additions at the Greatly Exceeds Expectations level:***<br><br>Develops and/or proposes alternative methods to perform work that improve efficiency and effectiveness.<br><br>Develops and/or implements highly effective solutions for unusual or more complex issues in a timely manner, carefully considering consequences.<br><br>Suggests innovative or creative solutions in response to new and emerging issues.<br><br>Considers both short- and long-term impact of recommendations and/or decisions.<br><br>Is available as a resource to others for identifying issues and solving problems. |

**Supervisor Comments:**

During the evaluation period, Mr. Moore was able to identify and analyze problems and issues and determine solutions and recommendations for resolving issues. For example, in the 2015 Section 31 inspections, he evaluated different alternatives for risk scoping which SROs to inspect for Section 31 compliance. His analysis created an enhanced risk selection process for not only the 2015 inspections, but for future Section 31 inspections. He also offered the large exam team on the inspections substantive guidance and procedures on how to best review the various SROs for Section 31 compliance. In the FINRA Fixed Income Inspection, working with his supervisor and the team, he used sound judgment to consider alternative methods for the exam team to review and explain perceived problems in FINRA's fixed income surveillance procedures. He also offered regular guidance to the team on effective methods to analyze FINRA's substantial production related to fixed income surveillance.



Employee's Last Name: Moore

| Rating: (click here for the rating scale descriptions for the performance standards) | | | | |
|---|---|---|---|---|
| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
| ☐ | ☐ | ☐ | ☒ | ☐ |



Employee's Last Name: Moore

OCIE

MONAHAN, KATHERINE K

U.S. Securities and Exchange Commission

# Performance Work Plan

☐ Entire Appraisal Period
☐ Detail (From:__________ To:__________)
☐ Other (specify):__________

| Employee's Name (Last, First, MI) Monahan, Katherine | Job Series | Pay Grade SK-15 | Appraisal Period (Month/Year) From: 10/01/2014 To: 09/30/2015 |
|---|---|---|---|
| Position Title Exam Manager | Office/Division OCIE-Office of Market Oversight | | Branch |
| Rating Official's Name (Last, First, MI) Gartman, Grant A | Rating Official's Position Title Assistant Director | | |

## Part 1: Performance Communications

**Performance Planning (to be held within 30 days of the beginning of the performance review cycle)**

*Performance expectations are fully discussed during this meeting. The rating official and employee are expected to reach a "good faith," mutual understanding of the expectations identified in this PWP. The rating official retains ultimate discretion regarding work assignments and expectations.*

| | |
|---|---|
| Employee's Signature (I acknowledge that performance expectations outlined in this PWP have been discussed fully with me.) [signature] | Date 10/27/14 |
| Rating Official's Signature [signature] | Date 10/29/14 |

### Interim Review

**Interim Review (attach additional Interim Review Sheets, as required)**

*Interim reviews focus on the employee's performance and accomplishments to date. A minimum of one interim review must be conducted during the performance cycle. The interim review will generally take place halfway through the rating cycle.*

Interim Review Summary:

See attached

| | |
|---|---|
| Employee's Signature (acknowledging receipt of this feedback) [signature] | Date 5/22/15 |
| Rating Official's Signature [signature] | Date 5/22/15 |

### Summary Rating

**RATING OFFICIAL'S RECOMMENDED RATING FOLLOWING CALIBRATION MEETING**

| | |
|---|---|
| Rating of Record 4 - Exceeds Expectations | |
| Rating Official's Signature [signature] | Date 12/21/15 |
| Second Level Supervisor's Signature [signature] | Date 01/04/16 |

**PERFORMANCE REVIEW COMMITTEE'S RECOMMENDED RATING**

| | |
|---|---|
| Rating of Record 4 | |
| Committee Official's Signature [signature] | Date 1/11/16 |

**DECIDING OFFICIAL'S RATING OF RECORD DETERMINATION**

| | |
|---|---|
| Rating of Record 4 | |
| Deciding Official's Signature [signature] | Date 1/11/16 |

Employee's Last Name: Monahan

## *Part 2: Performance Objectives*

***Performance is appraised in light of what is reasonably achievable given the employee's experience level, the complexity of assignments, and factors within the employee's control. Please refer to PWP Instructions for further details on rating scales.***

**Performance Objectives must be aligned with relevant goals from the SEC Strategic Plan. Please select the most applicable goal for your Office/Division:**

X Goal 1: Foster and enforce compliance with the federal securities laws
☐ Goal 2: Establish an effective regulatory environment
☐ Goal 3: Facilitate access to the information investors need to make informed investment decisions
☐ Goal 4: Enhance the Commission's performance through effective alignment and management of human, information, and financial capital

**Objective #1**

***Program Management:***
Effectively manages the planning, staffing, scheduling, and execution of assigned examinations consistent with OCIE policies and Office objectives, including by providing examiners with useful and timely guidance, promptly identifying and addressing issues with individual examiners and exam teams, and by communicating to and consulting with senior managers as appropriate;

Leads branch effectively by setting a positive and professional tone and example for examiners, motivating them to fulfill SEC's mission by accomplishing OCIE's and the Office's goals and objectives, and by effectively implementing guidance and direction of senior management; and

Promotes and maintains an environment of cooperation and creates a high level of team cohesion by empowering examiners, working with other branches, sharing relevant information within and across branches and with senior managers, and seeking to develop and utilize the contributions of all examiners.

**Supervisor Comments:**

Ms. Monahan has good program management skills. She is very proactive and efficient in ensuring her projects are progressing timely and appropriately. During the evaluation period, Ms. Monahan effectively managed the planning, staffing and execution of several significant projects. For example, [redacted]. In all of her assigned inspections, Ms. Monahan diligently and effectively reviewed inspection related documents, including scope memoranda, document requests, and interview questions. Her review of these documents helped to ensure the staff's work product was of a high caliber.

Ms. Monahan was also responsible for managing the Project Improvement Team, which included among other things, the coordination of meetings, drafting agenda items, and bringing recommendations for office improvements to management's attention. In addition, Ms. Monahan managed a number of TCRs during the rating period. Finally, Ms. Monahan managed and drafted the monthly Market Oversight newsletter and maintains the Market Oversight management spreadsheet.

In carrying out these and other responsibilities, she consistently provided exam staff and her managers with timely and useful guidance and set a positive and professional tone for the office.

**Rating: (click here for the rating scale descriptions for the performance objectives)**

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ |

**Objective #2**

***Risk Based Analysis:***

Appropriately and timely evaluates and adjusts scope and methodology of exams in response to new information, priorities, and guidance gleaned from relevant sources so that risk factors are fully analyzed and addressed;

Properly and consistently addresses risk factors when communicating significant findings, emerging issues, and industry trends to senior managers, and in reporting to Enforcement, SROs, and other regulators matters meriting their attention; and

Contributes to planning of exams and sweeps by suggesting targets and issues based on assessments of registrants, industry trends, and regulatory developments.

**Supervisor Comments:**

Ms. Monahan evaluates and adjusts, as appropriate, the scope and methodology of examinations in response to information, guidance, and priorities so that risk factors are fully analyzed and addressed. During the evaluation period, she contributed to the planning of exams by suggesting appropriate risk factors and areas of review. For example, in th[redacted] Regulation Insourcing Inspections, she effectively worked with [redacted] examination teams to identify risk areas as well as best practices to address those risks. In addition, while on-site at the [redacted]spection, Ms. Monahan worked diligently with the examination team to [redacted] risk areas where adequately reviewed. In reviewing TCRs, she continually assesses the risks related to each TCR to determine the appropriate disposition.

**Rating: (click here for the rating scale descriptions for the performance objectives)**

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ |

**Objective #3**

***Communication and Coordination:***

Ensures that written work product, both that of the Branch Chief and that of his or her branch (and including deficiency letters and other correspondence, electronic database entries, work papers, and examination reports) has been timely completed, complies with OCIE and Office guidance and policies, and is well organized, clear and concise, substantively complete, factually accurate, and grammatically correct;

Timely reviews planning memos, exam and inspection reports, deficiency letters, and other written work product to ensure that examiners have followed relevant guidance and standards, performed meaningful and relevant analyses, have exercised sound judgment in making scope and testing decisions and reaching conclusions, accurately cited proper sources of legal and regulatory authority, and can reliably document findings of deficiencies and weaknesses;

Cooperates within and across branches and other parts of the Office to share resources and better accomplish branch, Office, and SEC objectives;

Keeps registrants appropriately and timely apprised of developments in examinations and follows up, as necessary, with registrants regarding examination questions or deficiencies; and

Effectively coordinates with other offices and divisions, as necessary, to resolve examination issues and incorporate appropriate feedback into work product and provide other divisions and offices with technical and examination expertise.

**Supervisor Comments:**

Ms. Monahan effectively communicates and collaborates with staff both within the national exam program and in other Divisions and Offices in a timely manner. For example, in her review of numerous TCRs during the rating period, Ms. Monahan effectively coordinated with [redacted] in order [redacted] the appropriate resolution of the TCRs. In addition, Ms. Monahan timely reviews inspection reports, scope memoranda, planning memoranda, TCR closing memoranda, and other written work product to ensure that the staff follows relevant guidance and standards as well as performs meaningful and relevant analyses, accurately cites proper sources of legal and regulatory authority, and reliably documents findings and recommendations. For instance, in the [redacted] she edited the report and worked effectively with the inspection team to timely complete the report. In all the inspections Ms. Monahan worked on during the review period [redacted] Ms. Monahan ensured that staff work product was thorough, well-written, and focused on the appropriate areas and risks.

**Rating: (click here for the rating scale descriptions for the performance objectives)**

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ |

**Objective #4:**

***Expert Advice:***

Effectively and timely advises and consults with senior managers regarding new information and potential risk factors identified during exams and other assigned projects, material issues with individual examiners or teams, and market events;

Effectively uses technical and other expertise and resources to enhance examination selection, planning, scoping, testing, and reporting;

Takes initiative to develop and maintain skills and expertise, including by participating on exams, reading Commission releases, industry press, and other relevant sources so as to keep well apprised of developments and changes in the industry generally, at specific registrants, and regarding Commission rules, policies, procedures, and practices; and

Pursues opportunities to contribute to the sharing of information and enhancing of cooperation in forums such as joint and coordinated exams, in inter-regulatory conferences, industry and investor outreach efforts, or examiner training programs.

**Supervisor Comments:**

Ms. Monahan consistently advised and consulted with her supervisors and colleagues on potential risk areas identified during exams and other projects. She effectively uses technical and other expertise and resources to enhance examination planning, scoping, testing, and report drafting. Specifically, Ms. Monahan's SRO inspection experience enhances the scoping, planning, and thoroughness of [redacted] inspections and other work product. For example, during the [redacted] she used her extensive knowledge and experience regarding [redacted] identify potential risks areas in the program. On the [redacted], Ms. Monahan worked hard with exam team to identify areas of risk for review. With respect to her assigned TCRs, Ms. Monahan provided her Assistant Directors and exam staff with sound advice on the best methods to review and follow up on these TCRs.

Ms. Monahan also participated in numerous relevant trainings during the evaluation period in order to develop and maintain her skills, including multiple trainings on the fundamentals of options and derivatives.

**Rating: (click here for the rating scale descriptions for the performance objectives)**

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ |

**Objective #5**

***Resource Management and Development:***

Manages staff and other resources effectively by continually focusing on achieving objectives of the Office while adapting to changing priorities, anticipating obstacles, and effectively handles multiple assignments and responsibilities, including by taking on additional projects without compromising timeliness or quality of work;

Demonstrates consistent diligence, care, and judgment in delegating tasks, making examiner assignments, providing work plans and guidance, establishing examiner expectations on an ongoing basis, coaching and mentoring examiners including with constructive and measurable feedback, and timely and appropriately accomplishing necessary administrative and personnel responsibilities;

Shows creativity, develops and implements new processes and procedures that improve efficiency or effectiveness; and

Contributes to recruiting, motivating, developing, and retaining highly qualified examiners to achieve the long-term goals of the Office and the Commission.

**Supervisor Comments:**

During the evaluation period, Ms. Monahan effectively managed staff and other resources in order to achieve the objectives of the office. She efficiently handled multiple assignments and responsibilities and set clear performance expectations and effectively assigned, coordinated, and monitored the work of others. Ms. Monahan also appropriately delegated assignments to staff and oversaw staff's performance of these responsibilities. For example, in the [redacted] inspections, she divided responsibilities among the exam teams and monitored staff's performance to ensure assignments were completed in an appropriate and timely manner. With respect to her assigned TCRS, she worked with staff and Assistant Directors to review and prioritize the TCRs to ensure they were completed in an efficient manner. She offered staff guidance and assistance when necessary, which she demonstrated in her assigned inspections. Ms. Monahan also contributed to the motivating, developing and retaining of [redacted]

PWP 2014

Employee's Last Name: Monahan

| |
|---|
| staff through her work managing the Project Improvement Team, whose purpose is to make recommendations for office improvement to management. |

| Rating: (click here for the rating scale descriptions for the performance objectives) | | | | |
|---|---|---|---|---|
| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
| ☐ | ☐ | ☐ | ☒ | ☐ |

## Part 3: Performance Standards

*Performance is appraised in light of what is reasonably achievable given the employee's experience level, the complexity of assignments, and factors within the employee's control. Please refer to PWP Instructions for further details on rating scales.*

| Standard: Managing Human Resources | | |
|---|---|---|
| Competency Definition: Plans, distributes, coordinates, and monitors work assignments; evaluates work performance and provides constructive feedback by taking action to address performance problems; ensures staff are appropriately selected and utilized and are treated in a fair and equitable manner regardless of race, gender, age, religion, and other individual differences. | | |
| Unacceptable (1) | Meets Expectations (3) | Greatly Exceeds Expectations (5) |
| Fails to regularly monitor, evaluate, or document the performance of work unit members against performance measures to ensure quality and timeliness standards are met; fails to ensure performance distinctions are made among individuals.<br><br>Fails to set clear performance expectations and does not effectively assign, coordinate, or monitor the work of others; fails to provide candid and useful feedback and coaching to improve performance. Fails to consider staff expertise and experience when assigning and monitoring work.<br><br>Does not support or adhere to applicable personnel policies and regulations, including Merit System Principles and EEO policies; does not monitor the work environment and promptly address allegations of discrimination by taking appropriate action.<br><br>Does not address performance and conduct problems in a fair, timely, honest, and respectful manner in accordance with applicable policies and procedures. Fails to appropriately escalate issues.<br><br>Does not identify or effectively advocate for the human resources necessary to support and contribute to mission requirements; | Regularly monitors, evaluates, and documents the performance of work unit members against performance measures to ensure quality and timeliness standards are met; ensures performance distinctions are made among individuals.<br><br>Sets clear performance expectations and effectively assigns, coordinates, and monitors the work of others; provides candid and useful feedback and coaching to improve performance. Considers staff expertise and experience when assigning and monitoring work.<br><br>Actively supports and adheres to all applicable personnel policies and regulations, including Merit System Principles and EEO policies; monitors the work environment and promptly addresses allegations of discrimination, taking appropriate action.<br><br>In accordance with applicable policies and procedures, addresses performance and conduct problems in a fair, timely, and respectful manner. Appropriately escalates issues as needed.<br><br>Identifies and effectively | *Additions at the Greatly Exceeds Expectations level:*<br><br>Uses the performance management system to reinforce and foster superior performance.<br><br>Strives to increase motivation by tailoring methods of reward and recognition to the individual.<br><br>Identifies potential performance problems before they become serious and gives early feedback to eliminate problems. Addresses performance issues in an honest, respectful, candid, and fair manner, while striving to maintain the receiver's motivation.<br><br>Anticipates skill needs that are consistent with organizational trends and changing priorities; identifies developmental opportunities for staff to address these needs.<br><br>Demonstrates excellence in the application of Merit System Princi and EEO policies by proposing innovative methods to achieve thos goals; documented actions show that equal access to employment programs and opportunities is a priority.<br><br>Anticipates changes in workload requirements and adapts or advocates for human resources well in advance of when they are needed, resulting in greater productivity. |

| | | |
|---|---|---|
| fails to effectively carry out recruiting and hiring strategies to attract and retain highly qualified candidates and effectively integrate them into the work unit. | advocates for the human resources necessary to support and contribute to mission requirements; effectively carries out recruiting and hiring strategies to attract and retain highly qualified candidates and integrate them into the work unit. | |

**Supervisor Comments:**

Ms. Monahan diligently coordinated, monitored and evaluated staff work assignments and performance. She set clear performance expectations and effectively assigned, coordinated, and monitored the work of others. For example, [redacted], she distributed work among all the exam team members and offered guidance on how to complete that work. She also monitored staff performance and progress on completing the assignments to ensure the inspections were completed in a timely manner. In her TCR reviews, she worked with the exam team members to review the relevant issues and determine appropriate responses and dispositions for the TCRs. Ms. Monahan is approachable and treats all staff members and her supervisors with courtesy and respect. As noted, during the evaluation period, she actively participated in the Project Improvement Team.

**Rating: (click here for the rating scale descriptions for the performance standards)**

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ |

**Standard: Diversity and Inclusion**

Competency Definition: Champions and promotes a diverse and inclusive work environment in which all employees have an opportunity to be productive by managing, developing, and treating staff equitably regardless of individual differences. Contributes to a culture of respecting and appreciating diversity and the benefits of a diverse workforce through participating in diversity awareness activities.

| Unacceptable (1) | Meets Expectations (3) | Greatly Exceeds Expectations (5) |
|---|---|---|

| | | |
|---|---|---|
| Fails to respect cultural, race, gender, and other individual differences in the workforce.<br><br>Fails to participate in the implementation of strategies to retain diverse employees and assimilate them into the work unit.<br><br>Fails to participate in diversity-related efforts (for example, does not speak at diversity events hosted by the SEC or diverse professional and/or community organizations, does not contribute to the development of a high-quality, diverse workforce by supporting and/or participating in the agency's diversity recruiting and hiring efforts. | In accordance with agency diversity and inclusion policies, procedures, and initiatives:<br><br>As appropriate, regularly solicits and acknowledges diverse ideas and points of view of all staff (for example, via regular staff meeting discussions) to gain an understanding of the differing perspectives and priorities of others in the work unit. Considers this information when making decisions. Communicates outcome to staff in a way that demonstrates diverse ideas and viewpoints were considered.<br><br>Encourages staff participation in diversity and inclusion efforts (for example, written communications to staff encouraging and commending participation in diversity-related efforts; adjusting work load demands, as appropriate, to facilitate participation in agency diversity and inclusion efforts; etc.). | ***Additions at the Greatly Exceeds Expectations level:***<br><br>Participates in the implementation of strategies to retain employees and assimilate them into the work unit.<br><br>When initiating new contracts for goods and services, requests information from, and considers utilizing, minority-owned and women-owned businesses to fulfill the agency's business needs.<br><br>Promotes and/or participates in inclusion and diversity-related efforts. Examples include, but not limited to:<br>--speaks at diversity events hosted by the SEC or by diverse professional and/or community organizations,<br>--contributes to the development of a high-quality, diverse workforce by supporting and/or participating in the agency's diversity recruiting and hiring efforts, etc.<br>--recruits at minority-focused colleges and women's colleges, and at job fairs in urban communities;<br>--mentors and facilitates agency internship opportunities for young minorities and women and individuals with disabilities; and,<br>--participates in agency programs targeting high schools in underserved communities to provide mentoring and financial literacy education). |

**Supervisor Comments:**

During the evaluation period, Ms. Monahan applied management principles that promoted and fostered a diverse and inclusive work environment. She consistently treated all employees equitably and with courtesy and respect. She effectively demonstrated these principles in managing the [redacted]nd in her oversight of assigned TCRs. In addition, she participated in the Project Improvement Teams, which helps to retain and develop a diverse and high quality work force fo[redacted]

**Rating: (click here for the rating scale descriptions for the performance standards)**

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☒ | ☐ | ☐ |

PWP 2014 Employee's Last Name: Monahan

**Standard: Workload Management**

Competency Definition: Organizes work, sets priorities, and determines short- or long-term goals and strategies to achieve them; coordinates with stakeholders; monitors progress toward goals and evaluates outcomes. Adapts behavior or work methods in response to new information, changing conditions, or unexpected obstacles; effectively deals with ambiguity. Displays a high level of initiative and commitment towards completing assignments in a timely manner and is independently motivated to achieve results.

| Unacceptable (1) | Meets Expectations (3) | Greatly Exceeds Expectations (5) |
|---|---|---|
| Does not plan, organize, or prioritize work to complete assignments in a timely and effective manner; fails to keep others informed of progress and status and escalate issues as appropriate.<br><br>Fails to make adjustments to work priorities and schedules to address emerging issues, changing priorities and/or scope; ineffectively deals with ambiguity.<br><br>Does not coordinate with others to set priorities in support of objectives, complete work, or utilize available resources.<br><br>Fails to demonstrate a willingness to become knowledgeable about new areas in response to changing priorities, strategies, or demands.<br><br>Does not manage obstacles in a manner that minimizes or avoids delays in the delivery of information, products, and services.<br><br>Does not accept responsibility or take ownership of actions and work. | Plans, organizes, and prioritizes work to complete assignments in a timely and effective manner; keeps others informed of progress and status and escalates issues as appropriate.<br><br>Makes adjustments to work priorities and schedules to address emerging issues, changing priorities and/or scope; effectively deals with ambiguity.<br><br>Completes work or projects by coordinating with others to best utilize available resources and set priorities in support of objectives.<br><br>Demonstrates a willingness to become knowledgeable about new areas in response to changing priorities, strategies, or demands.<br><br>Manages obstacles in a manner that minimizes or avoids delays in the delivery of information, products, and services.<br><br>Accepts responsibility and takes ownership of actions and work. | ***Additions at the Greatly Exceeds Expectations level:***<br><br>Anticipates and makes adjustments to plans, priorities, and schedules to respond to changing work situations or requirements, even in difficult situations.<br><br>Remains productive and develops contingency plans when responding to competing priorities.<br><br>Takes initiative to interpret emerging issues that affect assignments and adapts products and services as needed.<br><br>Persists in overcoming obstacles to accomplish assignments; rapidly adjusts plans, goals, and priorities to meet deadlines.<br><br>Independently recognizes and adapts to ambiguous and uncertain situations.<br><br>Seeks out new responsibilities, assignments, challenges, and opportunities to contribute, as appropriate.<br><br>Takes action to achieve outcomes and results that exceed requirements for quality, quantity, and/or timeliness. |

**Supervisor Comments:**

Ms. Monahan's work is generally of a high quality and completed in a timely and thorough manner. As noted, during the evaluation period, Ms. Monahan was responsible for a number of assignments including the [redacted] inspections, as well as a significant number of TCRs. Working with her supervisors and exam team members, she managed these projects by determining priorities and monitoring the progress of the work to ensure projects were completed in a timely manner. For example, in all her assigned inspections, Ms. Monahan worked with the Assistant Directors to divide work efficiently among the exam teams. She then monitored the staff's progress on the

work and timely addressed any issues that arose. She diligently ensured that work on her assigned inspection was completed in a timely manner.

Rating: (click here for the rating scale descriptions for the performance standards)

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ |

**Standard: Critical Thinking**

Competency Definition: Identifies problems and determines accuracy and relevance of information; uses sound judgment to generate and evaluate alternatives; makes recommendations and applies solutions. Makes sound, well-informed, and objective decisions; perceives the impact and implications of decisions; follows through on decisions and commits to a path to accomplish work goals even in uncertain situations.

| Unacceptable (1) | Meets Expectations (3) | Greatly Exceeds Expectations (5) |
|---|---|---|
| Fails to identify key issues; does not collect, evaluate, analyze, and integrate data/information to better define problems.<br><br>Does not draw on experience and available resources to propose informed and timely solutions, strategies, and/or procedures to effectively solve problems or issues; fails to appropriately escalate unusual situations.<br><br>Does not consider the consequences or impact of recommendations and/or decisions. | Identifies key issues and collects, evaluates, analyzes, and integrates data/information from appropriate sources to better define problems.<br><br>Draws on experience and appropriately utilizes resources to propose informed and timely solutions, strategies, and/or procedures to effectively solve problems or issues; appropriately escalates unusual situations.<br><br>Considers the consequences or impact of recommendations and/or decisions. | ***Additions at the Greatly Exceeds Expectations level:***<br><br>Develops and/or proposes alternative methods to perform work that improve efficiency and effectiveness.<br><br>Develops and/or implements highly effective solutions for unusual or more complex issues in a timely manner, carefully considering consequences.<br><br>Suggests innovative or creative solutions in response to new and emerging issues.<br><br>Considers both short- and long-term impact of recommendations and/or decisions.<br><br>Is available as a resource to others for identifying issues and solving problems. |

**Supervisor Comments:**

Ms. Monahan is a bright and critical thinker. She is able to identify and analyze problems and issues and determine appropriate solutions and recommendations for enhancements. For example, in the [redacted], and [redacted] inspections she demonstrated that she had an effective grasp of the relevant issues and concerns and worked with her Assistant Directors and the exam staff to ensure that these issues were incorporated into the scope of the staff's review and will be appropriately discussed in the final report. In addition, Ms. Monahan identifies, analyzes, and applies legal and securities-related issues that are relevant to the SRO inspection program and develops and implements effective solutions for complex and/or novel issues in a timely manner.

Rating: (click here for the rating scale descriptions for the performance standards)

| Unacceptable (1) | Needs | Meets | Exceeds | Greatly Exceeds |
|---|---|---|---|---|

PWP 2014 Employee's Last Name: [illegible]

| | Improvement (2) | Expectations (3) | Expectations (4) | Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ |

## *Part 4:- End-of-Performance Cycle Review*

**Employee's Narrative (attach additional sheets as needed)**

See Attached.

| | |
|---|---|
| **Employee's Signature** [signature] | Date 1/19/16 |
| **Rating Official's Signature** [signature] | Date 1/19/16 |
| *Signing indicates acknowledgement that the End-of-Performance Cycle Review Meeting took place to discuss employee accomplishments* | |

**Rating Official's Summary Narrative (attach additional sheets as needed)**

| | |
|---|---|
| **Employee's Signature** [signature] | Date 1/19/16 |
| **Rating Official's Signature** [signature] | Date 1/19/16 |
| *Signing indicates acknowledgement that the employee received the Rating Official's Summary Rating and accompanying narratives* | |

| | | |
|---|---|---|
| ☐ Employee declined to sign. | Comments: | Date |

PWP 2014

Employee's Last Name:

OCIE
CURLEY, CHRISTINE H.

U.S. Securities and Exchange Commission
# Performance Work Plan

☐ Entire Appraisal Period
☐ Detail (From:________ To:________)
☐ Other (specify):________

| | | | |
|---|---|---|---|
| Employee's Name *(Last, First, MI)* Curley, Christine | Job Series 0905 | Pay Grade SK-15 | Appraisal Period (Month/Year) From: 10/14 To: 9/15 |
| Position Title Exam Manager | Office/Division OCIE | | Branch SK6 #5 |
| Rating Official's Name *(Last, First, MI)* Lover, Kristen | Rating Official's Position Title Assistant Director | | |

## Part 1: Performance Communications

**Performance Planning (to be held within 30 days of the beginning of the performance review cycle)**

*Performance expectations are fully discussed during this meeting. The rating official and employee are expected to reach a "good faith," mutual understanding of the expectations identified in this PWP. The rating official retains ultimate discretion regarding work assignments and expectations.*

Employee's Signature *(I acknowledge that performance expectations outlined in this PWP have been discussed fully with me.)* Christine Curley Date 10/09/14

Rating Official's Signature [signature] Date 10/29/14

### Interim Review

**Interim Review (attach additional Interim Review Sheets, as required)**

*Interim reviews focus on the employee's performance and accomplishments to date. A minimum of one interim review must be conducted during the performance cycle. The interim review will generally take place halfway through the rating cycle.*

Interim Review Summary:

Please see the attached.

Employee's Signature *(acknowledging receipt of this feedback)* Christine Curley Date 6/28/15

Rating Official's Signature [signature] Date 5/28/15

### Summary Rating

**RATING OFFICIAL'S RECOMMENDED RATING FOLLOWING CALIBRATION MEETING**

Rating of Record 4 (Exceeds Expectations)

Rating Official's Signature [signature] Date 1/7/16

Second Level Supervisor's Signature [signature] Date 01/7/16

**PERFORMANCE REVIEW COMMITTEE'S RECOMMENDED RATING**

Rating of Record 4

Committee Official's Signature [signature] Date 1/11/16

**DECIDING OFFICIAL'S RATING OF RECORD DETERMINATION**

Rating of Record 4

Deciding Official's Signature [signature] Date 1/11/16

Employee's Last Name: CURLEY

## *Part 2: Performance Objectives*

*Performance is appraised in light of what is reasonably achievable given the employee's experience level, the complexity of assignments, and factors within the employee's control. Please refer to PWP instructions for further details on rating scales.*

**Performance Objectives must be aligned with relevant goals from the SEC Strategic Plan. Please select the most applicable goal for your Office/Division:**

X Goal 1: Foster and enforce compliance with the federal securities laws
☐ Goal 2: Establish an effective regulatory environment
☐ Goal 3: Facilitate access to the information investors need to make informed investment decisions
☐ Goal 4: Enhance the Commission's performance through effective alignment and management of human, information, and financial capital

### Objective #1

***Program Management:***

Effectively manages the planning, staffing, scheduling, and execution of assigned examinations consistent with OCIE policies and Office objectives, including by providing examiners with useful and timely guidance, promptly identifying and addressing issues with individual examiners and exam teams, and by communicating to and consulting with senior managers as appropriate;

Leads branch effectively by setting a positive and professional tone and example for examiners, motivating them to fulfill SEC's mission by accomplishing OCIE's and the Office's goals and objectives, and by effectively implementing guidance and direction of senior management; and

Promotes and maintains an environment of cooperation and creates a high level of team cohesion by empowering examiners, working with other branches, sharing relevant information within and across branches and with senior managers, and seeking to develop and utilize the contributions of all examiners.

### Supervisor Comments:

Christine greatly exceeded expectations in managing the six inspections that she was responsible for during the evaluation period. Christine served as the exam manager in six inspections and one prelaunch review. Specifically, as the exam manager on the [redacted] managed the planning, staffing, scheduling and execution of the inspections. In addition she skillfully handled the day to day progress of these inspections. For example, during the evaluation period, Christine adeptly executed the onsite portions of [redacted] inspections. In preparation for these onsites, she skillfully oversaw that all the pre-field work was conducted timely by the team, including the review of production documents, background research, and drafting of interview questions and modules by communicating and carefully coordinating with the team and her supervisor. In addition, in the [redacted] exam, Christine provided useful and timely guidance to the Staff regarding [redacted] documentation requirements when handling financial surveillance Exception Disposition Reports (EDRs) which assisted them in their reviews. Christine also capability led the ROOR inspection team which consisted of several regional office examiners and motivated them to detect findings and to write well supported observations of merit by holding regular team meetings and setting a high and professional standard. She promoted a high level of team cohesion by empowering examiners by assigning them specific subject matter review areas and seeking out and valuing each team members' opinion and comment on [redacted] practices. In each of her assignments, Christine regularly and appropriately communicated with her supervisors regarding the status of the inspections, suggested next steps, and she presented any questions or issues that arose and potential solutions to those issues. Christine is at all times knowledgeable about any exam that she is assigned to and moves each of her inspections along on a timely basis. Her highly skilled managing of multiple exams exceeds that of someone with much greater experience and requires far less guidance than would ordinarily be expected for Christine's level of experience. Christine's effective program management had a highly significant positive impact on Market

Oversight.

**Rating: (click here for the rating scale descriptions for the performance objectives)**

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ |

**Objective #2**

***Risk Based Analysis:***

Appropriately and timely evaluates and adjusts scope and methodology of exams in response to new information, priorities, and guidance gleaned from relevant sources so that risk factors are fully analyzed and addressed;

Properly and consistently addresses risk factors when communicating significant findings, emerging issues, and industry trends to senior managers, and in reporting to Enforcement, SROs, and other regulators matters meriting their attention; and

Contributes to planning of exams and sweeps by suggesting targets and issues based on assessments of registrants, industry trends, and regulatory developments.

**Supervisor Comments:**

Christine appropriately and timely evaluates and adjusts the scope and methodology of exams in response to new information. For example, based on information learned from her involvement in the [redacted] inspection regarding referrals of surveillance alerts to the member's DEA, Christine competently adjusted the scope of the [redacted] inspection to include referral reviews thereby ensuring that the risk factor was analyzed and addressed. Similarly, after the onsite portion of the [redacted] inspection was completed, Market Oversight received [redacted] failure to investigate improper fees being charged to customers by clearing firms. Christine adeptly adjusted the scope of the exam to include a review of [redacted] procedures for review of fees to ensure that risk factor was being addressed. Christine also [redacted] and consistently addresses risk factors when communicating significant findings. For example, in th[redacted] inspection, Christine noted FINRA's lack of documentation in review of financial surveillance EDRs. When communicating this finding to her supervisor, she adeptly noted that this weakness could result in [redacted] not timely identifying a firm in financial trouble because [redacted]pervisors may not have documentation to access whether the resolution was appropriate. Her work in this regard had a highly significant impact on achieving the Commission's goal of protecting investors.

**Rating: (click here for the rating scale descriptions for the performance objectives)**

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ |

**Objective #3**

***Communication and Coordination:***

Ensures that written work product, both that of the Branch Chief and that of his or her branch (and including deficiency letters and other correspondence, electronic database entries, work papers, and examination reports) has been timely completed, complies with OCIE and Office guidance and policies, and is well organized, clear and concise, substantively complete, factually accurate, and grammatically correct;

Timely reviews planning memos, exam and inspection reports, deficiency letters, and other written work product to ensure that examiners have followed relevant guidance and standards, performed meaningful and relevant analyses, have exercised sound judgment in making scope and testing decisions and reaching conclusions, accurately cited proper sources of legal and regulatory authority, and can reliably document findings of deficiencies and weaknesses;

Cooperates within and across branches and other parts of the Office to share resources and better accomplish

branch, Office, and SEC objectives;

Keeps registrants appropriately and timely apprised of developments in examinations and follows up, as necessary, with registrants regarding examination questions or deficiencies; and

Effectively coordinates with other offices and divisions, as necessary, to resolve examination issues and incorporate appropriate feedback into work product and provide other divisions and offices with technical and examination expertise.

**Supervisor Comments:**

Christine greatly exceeded expectations in ensuring the written work for the inspections that she was responsible for were well-supported, well-organized, clear and concise, substantively complete, factually correct and grammatically correct. For example, in the [redacted] inspection, she proficiently provided the lead examiner many edits to the examination report and exit outline to ensure that they contained necessary details and support for conclusions and were organized adequately and error free. In addition, for the TCRs that she was responsible for she reviewed each closing memo to ensure that the proper office format was used, each element was addressed and that the facts and law were properly analyzed and conclusions were well supported. She also worked to ensure that her work product complied with [redacted]d Office guidance and policies. For example, in the [redacted]s inspections, she worked with the respective lead examiners to ensure that each Scope Memorandum, Document Requests and Deficiency Letter or exit outlines satisfied applicable guidance and policies from the NEP manual as well as MO requirements. She also diligently worked to ensure that TRENDS reflected the current status and contained all appropriate work papers. In addition Christine worked effectively with other Divisions to resolve examination issues. For example, she conferred with [redacted] to discuss the definition of fully hedged as required in the contingent trade rule as part of the [redacted] inspections to determine whether [redacted] were properly surveilling for the fully hedged requirement. Christine consistently produces a high standard of quality work that is thorough and requires few revisions. She serves as a role model for others exam managers and Market Oversight staff.

**Rating: (click here for the rating scale descriptions for the performance objectives)**

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ |

**Objective #4**

***Expert Advice:***

Effectively and timely advises and consults with senior managers regarding new information and potential risk factors identified during exams and other assigned projects, material issues with individual examiners or teams, and market events;

Effectively uses technical and other expertise and resources to enhance examination selection, planning, scoping, testing, and reporting;

Takes initiative to develop and maintain skills and expertise, including by participating on exams, reading Commission releases, industry press, and other relevant sources so as to keep well apprised of developments and changes in the industry generally, at specific registrants, and regarding Commission rules, policies, procedures, and practices; and

Pursues opportunities to contribute to the sharing of information and enhancing of cooperation in forums such as joint and coordinated exams, in inter-regulatory conferences, industry and investor outreach efforts, or examiner training programs.

**Supervisor Comments:**

Christine effectively and timely advises and consults with senior managers regarding potential risk factors identified during her projects. For example, in the [redacted]spection, Christine skillfully identified a risk

factor regarding [redacted] reliance on participant letters on file asserting that all of their respective trades at [redacted] re qualified contingent trades so [redacted] waived trade reviews during those participants' compliance [redacted]. She discussed this observation [redacted] her supervisor and as a result trade, reviews became a focus area of both QCT inspections. In addition, Christine uses her experience and technical expertise to enhance examination selection, and planning and scoping of ins[redacted] the lead examiner in the [redacted] inspection to use information in [redacted] member firm exam reports and risk ratings to assist in selection of firms. Christine also contributed to the sharing of information and enhancing cooperation in joint inspections. Specifically, she actively participated and effectively coordinated the [redacted] exam with staff from the Chicago, Philadelphia and New York regional offices. In addition, Christine [redacted] liminary findings regarding [redacted] surveillance of QCTs to the [redacted]. Christine's work in this regard had a direct and significant positive impact on achieving OCIE's goal of promoting compliance.

Rating: (click here for the rating scale descriptions for the performance objectives)

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ |

Objective #5

*Resource Management and Development:*

Manages staff and other resources effectively by continually focusing on achieving objectives of the Office while adapting to changing priorities, anticipating obstacles, and effectively handles multiple assignments and responsibilities, including by taking on additional projects without compromising timeliness or quality of work;

Demonstrates consistent diligence, care, and judgment in delegating tasks, making examiner assignments, providing work plans and guidance, establishing examiner expectations on an ongoing basis, coaching and mentoring examiners including with constructive and measurable feedback, and timely and appropriately accomplishing necessary administrative and personnel responsibilities;

Shows creativity, develops and implements new processes and procedures that improve efficiency or effectiveness; and

Contributes to recruiting, motivating, developing, and retaining highly qualified examiners to achieve the long-term goals of the Office and the Commission.

Supervisor Comments:

Christine exceeded expectations in managing and developing resources. She effectively handles multiple assignments and responsibilities. For example, during the evaluation period, Christine participated in seven inspections and one prelaunch review and was responsible for investigating numerous TCRs. In addition, she handled various administrative tasks, including reviewing NYSE Rule 497 and Nasdaq Rule 4370 quarterly listings reports as well handling special projects. For example, she took on the additional project of assisting the BD group to implement SAR handling guidelines at the [redacted] She willingly took on the project and did not compromise the quality or timeliness of her other work. She also managed staff effectively by adapting to changing priorities and anticipating obstacles. For example, Christine worked diligently to expedite and complete all of her work projects in anticipation of her upcoming extended leave to minimize any disruption in her inspections. She also effectively contributed to developing new staff. For example, in the [redacted] inspection, she regularly met with the lead examiner, who was in that role for the first time, to inform him about the exam process, providing guidance on the conduct of

Employee's Last Name: CURLEY

the exam and coaching him on format and follow up after the onsite and reviewing edits to his written work product. Also, Christine demonstrated care and good judgment in delegating tasks and making examiner assignments. For example, she determined the number and appropriate expertise of examiners needed to follow up to find additional examples on the use of repeated language in EDR resolutions in the [redacted] program. Despite her considerable workload, Christine's work was timely and of a high quality. In addition, Christine effectively contributed to developing new staff. Christine's capacity to handle many assignments effectively allows Market Oversight to conduct more inspections, which significantly positively impacts the Commission's goal of protecting investors.

Rating: (click here for the rating scale descriptions for the performance objectives)

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ |

Employee's Last Name: CURLEY

## *Part 3: Performance Standards*

*Performance is appraised in light of what is reasonably achievable given the employee's experience level, the complexity of assignments, and factors within the employee's control. Please refer to PWP Instructions for further details on rating scales.*

| Standard: Managing Human Resources | | |
|---|---|---|
| Competency Definition: Plans, distributes, coordinates, and monitors work assignments; evaluates work performance and provides constructive feedback by taking action to address performance problems; ensures staff are appropriately selected and utilized and are treated in a fair and equitable manner regardless of race, gender, age, religion, and other individual differences. | | |
| Unacceptable (1) | Meets Expectations (3) | Greatly Exceeds Expectations (5) |
| Fails to regularly monitor, evaluate, or document the performance of work unit members against performance measures to ensure quality and timeliness standards are met; fails to ensure performance distinctions are made among individuals.<br><br>Fails to set clear performance expectations and does not effectively assign, coordinate, or monitor the work of others; fails to provide candid and useful feedback and coaching to improve performance. Fails to consider staff expertise and experience when assigning and monitoring work.<br><br>Does not support or adhere to applicable personnel policies and regulations, including Merit System Principles and EEO policies; does not monitor the work environment and promptly address allegations of discrimination by taking appropriate action.<br><br>Does not address performance and conduct problems in a fair, timely, honest, and respectful manner in accordance with applicable policies and procedures. Fails to appropriately escalate issues.<br><br>Does not identify or effectively advocate for the human resources necessary to support and contribute to mission requirements; fails to effectively carry out recruiting and hiring strategies to attract and retain highly qualified candidates and effectively integrate them into the work unit. | Regularly monitors, evaluates, and documents the performance of work unit members against performance measures to ensure quality and timeliness standards are met; ensures performance distinctions are made among individuals.<br><br>Sets clear performance expectations and effectively assigns, coordinates, and monitors the work of others; provides candid and useful feedback and coaching to improve performance. Considers staff expertise and experience when assigning and monitoring work.<br><br>Actively supports and adheres to all applicable personnel policies and regulations, including Merit System Principles and EEO policies; monitors the work environment and promptly addresses allegations of discrimination, taking appropriate action.<br><br>In accordance with applicable policies and procedures, addresses performance and conduct problems in a fair, timely, and respectful manner. Appropriately escalates issues as needed.<br><br>Identifies and effectively advocates for the human resources necessary to support and contribute to mission requirements; effectively carries out recruiting and hiring strategies to attract and retain highly qualified candidates and integrate them into the work unit. | ***Additions at the Greatly Exceeds Expectations level:***<br><br>Uses the performance management system to reinforce and foster superior performance.<br><br>Strives to increase motivation by tailoring methods of reward and recognition to the individual.<br><br>Identifies potential performance problems before they become serious and gives early feedback to eliminate problems. Addresses performance issues in an honest, respectful, candid, and fair manner, while striving to maintain the receiver's motivation.<br><br>Anticipates skill needs that are consistent with organizational trends and changing priorities; identifies developmental opportunities for staff to address these needs.<br><br>Demonstrates excellence in the application of Merit System Principles and EEO policies by proposing innovative methods to achieve those goals; documented actions show that equal access to employment programs and opportunities is a priority.<br><br>Anticipates changes in workload requirements and adapts or advocates for human resources well in advance of when they are needed, resulting in greater productivity. |

Employee's Last Name: CURLEY

**Supervisor Comments:**

. Christine exceeds expectations in setting clear performance expectations and effectively assigning, coordinating and monitoring the work of others. For example, she effectively communicated with the staff through frequently held staff meetings and by setting reasonable deadline dates and monitoring the team's progress in their reviews of productions in the contingent trade inspections. She also ensured that follow up calls were timely scheduled, thoroughly conducted and documented. In addition, in the ISE Mercury prelaunch review, she assisted in delegating assignments to the staff and clearly explained what areas to focus on. Also, Christine effectively considers staff expertise and experience when assigning and monitoring work. For example, she assigned the review of subordinated loans to examiners with strong accounting backgrounds and the Financial and Operational reviews of the largest firms to the New York regional office examiners with experience conducting large broker dealer exams. Christine also aids in integrating newer staff into the work unit. She considers tasks to assign to newer employees and the intern to keep them engaged in Market Oversight. Her supervisors appreciate her work in this regard.

**Rating: (click here for the rating scale descriptions for the performance standards)**

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ |

**Standard: Diversity and Inclusion**

Competency Definition: Champions and promotes a diverse and inclusive work environment in which all employees have an opportunity to be productive by managing, developing, and treating staff equitably regardless of individual differences. Contributes to a culture of respecting and appreciating diversity and the benefits of a diverse workforce through participating in diversity awareness activities.

| Unacceptable (1) | Meets Expectations (3) | Greatly Exceeds Expectations (5) |
|---|---|---|
| Fails to respect cultural, race, gender, and other individual differences in the workforce.<br><br>Fails to participate in the implementation of strategies to retain diverse employees and assimilate them into the work unit.<br><br>Fails to participate in diversity-related efforts (for example, does not speak at diversity events hosted by the SEC or diverse professional and/or community organizations, does not contribute to the development of a high-quality, diverse workforce by supporting and/or participating in the agency's diversity recruiting and hiring efforts. | In accordance with agency diversity and inclusion policies, procedures, and initiatives:<br><br>As appropriate, regularly solicits and acknowledges diverse ideas and points of view of all staff (for example, via regular staff meeting discussions) to gain an understanding of the differing perspectives and priorities of others in the work unit. Considers this information when making decisions. Communicates outcome to staff in a way that demonstrates diverse ideas and viewpoints were considered.<br><br>Encourages staff participation in diversity and inclusion efforts (for example, written communications to staff encouraging and commending participation in diversity-related efforts; adjusting work load demands, as appropriate, to facilitate | *Additions at the Greatly Exceeds Expectations level:*<br><br>Participates in the implementation of strategies to retain employees and assimilate them into the work unit.<br><br>When initiating new contracts for goods and services, requests information from, and considers utilizing, minority-owned and women-owned businesses to fulfill the agency's business needs.<br><br>Promotes and/or participates in inclusion and diversity-related efforts. Examples include, but not limited to:<br>--speaks at diversity events hosted by the SEC or by diverse professional and/or community organizations,<br>--contributes to the development of a high-quality, diverse workforce by supporting and/or participating in the agency's diversity recruiting and |

Employee's Last Name: CURLEY

| | | |
|---|---|---|
| | participation in agency diversity and inclusion efforts; etc.). | hiring efforts, etc.<br>--recruits at minority-focused colleges and women's colleges, and at job fairs in urban communities;<br>--mentors and facilitates agency internship opportunities for young minorities and women and individuals with disabilities; and,<br>--participates in agency programs targeting high schools in underserved communities to provide mentoring and financial literacy education). |

**Supervisor Comments:**

Christine respects cultural, race, gender and other individual differences in the workforce. She regularly solicits and acknowledges diverse ideas and points of view. For example, in her assignments during the evaluation period, she communicated with staff from different divisions with differing perspectives and points of view. She incorporated their thoughts into her reviews, which led to an improved work product. Specifically, in discussions regarding finding after the onsite portion the FINRA ROOR inspection, Christine thoughtfully listened to the points of view of all team members to gain an understanding of their perspectives. In addition, Christine encourages staff to participate in diversity events such as Market Oversight group parties. Christine also attended and actively participated in a Management Workshop on Diversity and Inclusion.

**Rating: (click here for the rating scale descriptions for the performance standards)**

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☒ | ☐ | ☐ |

**Standard: Workload Management**

Competency Definition: Organizes work, sets priorities, and determines short- or long-term goals and strategies to achieve them; coordinates with stakeholders; monitors progress toward goals and evaluates outcomes. Adapts behavior or work methods in response to new information, changing conditions, or unexpected obstacles; effectively deals with ambiguity. Displays a high level of initiative and commitment towards completing assignments in a timely manner and is independently motivated to achieve results.

| Unacceptable (1) | Meets Expectations (3) | Greatly Exceeds Expectations (5) |
|---|---|---|

| | | |
|---|---|---|
| Does not plan, organize, or prioritize work to complete assignments in a timely and effective manner; fails to keep others informed of progress and status and escalate issues as appropriate.<br><br>Fails to make adjustments to work priorities and schedules to address emerging issues, changing priorities and/or scope; ineffectively deals with ambiguity.<br><br>Does not coordinate with others to set priorities in support of objectives, complete work, or utilize available resources.<br><br>Fails to demonstrate a willingness to become knowledgeable about new areas in response to changing priorities, strategies, or demands.<br><br>Does not manage obstacles in a manner that minimizes or avoids delays in the delivery of information, products, and services.<br><br>Does not accept responsibility or take ownership of actions and work. | Plans, organizes, and prioritizes work to complete assignments in a timely and effective manner; keeps others informed of progress and status and escalates issues as appropriate.<br><br>Makes adjustments to work priorities and schedules to address emerging issues, changing priorities and/or scope; effectively deals with ambiguity.<br><br>Completes work or projects by coordinating with others to best utilize available resources and set priorities in support of objectives.<br><br>Demonstrates a willingness to become knowledgeable about new areas in response to changing priorities, strategies, or demands.<br><br>Manages obstacles in a manner that minimizes or avoids delays in the delivery of information, products, and services.<br><br>Accepts responsibility and takes ownership of actions and work. | *Additions at the Greatly Exceeds Expectations level:*<br><br>Anticipates and makes adjustments to plans, priorities, and schedules to respond to changing work situations or requirements, even in difficult situations.<br><br>Remains productive and develops contingency plans when responding to competing priorities.<br><br>Takes initiative to interpret emerging issues that affect assignments and adapts products and services as needed.<br><br>Persists in overcoming obstacles to accomplish assignments; rapidly adjusts plans, goals, and priorities to meet deadlines.<br><br>Independently recognizes and adapts to ambiguous and uncertain situations.<br><br>Seeks out new responsibilities, assignments, challenges, and opportunities to contribute, as appropriate.<br><br>Takes action to achieve outcomes and results that exceed requirements for quality, quantity, and/or timeliness. |

**Supervisor Comments:**

Christine exceeded expectations in effectively planning, organizing and prioritizing work to complete assignments in a timely and effective manner and keeping management informed of her progress and she seek additional guidance when appropriate. For example, during the evaluation period, she effectively managed, planned and organized th[redacted]nspection from the post onsite inspection through the exit outline stage. This was no small task and took much coordination since the team was comprised of members from around the country and the subject matter was rather complex. She capably organized the team and set priorities to ensure that the write ups were done timely and observations were well supported. For example, she set deadlines for the review write ups and set regular meetings to monitor the team's progress to adjust to any scheduling concerns. In addition, she eagerly takes on additional work demonstrating a willingness to become knowledgeable about new areas. For example, when Christine was consumed with finalizing pending inspections and projects in anticipation of her upcoming planned extended leave, she nevertheless willingly took on an additional inspection –[redacted]s Cooperation with States. She made appropriate adjustments to her work priorities and reviewed the document request and scope memo and initiated the inspection. Additionally, to ensure that a follow up review in the[redacted] QCT inspection of CHX's cycle exams were conducted and written up timely, she organized an in office

onsite so the team could work in an onsite like environment unobstructed by day to day interruptions. Finally, Christine accepts responsibility and takes full ownership of the inspections that she is assigned to and always keeps her supervisors informed of the progress and status of her assignments. She also takes initiative to ensure that all work is completed it a high quality and expedient manner. Christine's work is performed with little guidance and support.

**Rating: (click here for the rating scale descriptions for the performance standards)**

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☒ | ☐ |

**Standard: Critical Thinking**

Competency Definition: Identifies problems and determines accuracy and relevance of information; uses sound judgment to generate and evaluate alternatives; makes recommendations and applies solutions. Makes sound, well-informed, and objective decisions; perceives the impact and implications of decisions; follows through on decisions and commits to a path to accomplish work goals even in uncertain situations.

| Unacceptable (1) | Meets Expectations (3) | Greatly Exceeds Expectations (5) |
|---|---|---|
| Fails to identify key issues; does not collect, evaluate, analyze, and integrate data/information to better define problems.<br><br>Does not draw on experience and available resources to propose informed and timely solutions, strategies, and/or procedures to effectively solve problems or issues; fails to appropriately escalate unusual situations.<br><br>Does not consider the consequences or impact of recommendations and/or decisions. | Identifies key issues and collects, evaluates, analyzes, and integrates data/information from appropriate sources to better define problems.<br><br>Draws on experience and appropriately utilizes resources to propose informed and timely solutions, strategies, and/or procedures to effectively solve problems or issues; appropriately escalates unusual situations.<br><br>Considers the consequences or impact of recommendations and/or decisions. | *Additions at the Greatly Exceeds Expectations level:*<br><br>Develops and/or proposes alternative methods to perform work that improve efficiency and effectiveness.<br><br>Develops and/or implements highly effective solutions for unusual or more complex issues in a timely manner, carefully considering consequences.<br><br>Suggests innovative or creative solutions in response to new and emerging issues.<br><br>Considers both short- and long-term impact of recommendations and/or decisions.<br><br>Is available as a resource to others for identifying issues and solving problems. |

**Supervisor Comments:**

Christine greatly exceeds expectations in effectively identifying key issues and analyzing information. For example, in the [redacted]ualified contingent trade inspection, Christine effectively reviewed and analyzed all o[redacted] surveillance and examination procedures for reviewing qualified contingent trades. Based on her experience and information obtained in the[redacted] inspection, she immediately noted deficiencies In[redacted]eviews. Specifically, she identified blackout periods under which[redacted]will not investigate

Employee's Last Name: CURLEY

surveillance alerts that indicate the trade is not qualified for the [redacted] exception. Further, Christine understands [redacted] her observations. For example, she was aware of the significance of her finding that neither [redacted] the two entities wher[redacted] were adequately surveilling for compliance with the qualified contingent trade exception, recognizing that it was an industrywide problem. Christine also appropriately utilizes resources to solve problems. For example, she consulted with [redacted] or specialized examiner for options to understand the options trader's reasons for using [redacted] and for determining the appropriateness and determination of the hedge. Christine also serves as a resource to others for identifying issues and solving problems. For example, staff within [redacted] and across other offices and Divisions seek Christine's advice regarding the AML rules specifically for implementing SAR handling guidelines. Christine's critical thinking skills have had a highly significant impact in achieving [redacted] goal of helping SROs improve their regulatory programs to enforce compliance of the federal securities laws.

Rating: (click here for the rating scale descriptions for the performance standards)

| Unacceptable (1) | Needs Improvement (2) | Meets Expectations (3) | Exceeds Expectations (4) | Greatly Exceeds Expectations (5) |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☒ |

Employee's Last Name: CURLEY

## Part 4: End-of-Performance Cycle Review

**Employee's Narrative (attach additional sheets as needed)**

None provided

| | |
|---|---|
| **Employee's Signature** [signature] | **Date** 5/17/16 |
| **Rating Official's Signature** [signature] | **Date** 5/17/16 |

*Signing indicates acknowledgement that the End-of-Performance Cycle Review Meeting took place to discuss employee accomplishments*

**Rating Official's Summary Narrative (attach additional sheets as needed)**

Included

| | |
|---|---|
| **Employee's Signature** [signature] | **Date** 5/17/16 |
| **Rating Official's Signature** [signature] | **Date** 5/17/16 |

*Signing indicates acknowledgement that the employee received the Rating Official's Summary Rating and accompanying narratives*

| | | |
|---|---|---|
| ☐ Employee declined to sign.<br>☐ Employee unavailable to sign. | **Comments:** | Date |

Employee's Last Name: CURLEY

Receipt number AUSFCC-7375592

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Timothy Moore,

Plaintiff,

v.

Case No. 21-1931C

United States of America,

Defendant.

## COMPLAINT

## I. JURISDICTION

1. This is a claim by Timothy Moore, an employee of the Securities and Exchange Commission, a federal agency, against the United States for damages and ancillary relief under the Tucker Act, 28 USC 1491, the Equal Pay Act, 29 USC 206(d)(1), and the Back Pay Act, 5 USC 5596. The EPA amends the Fair Labor Standards Act and applies to the Federal Government. 29 USC 203(d), (e)(2) and (x).

## II. THE FACTS

2. Since March 2008, Plaintiff, a male, has been and continues to be employed by SEC as an attorney-advisor in a position known as Examination

Manager. His pay grade began as an SK-13. He was promoted to SK-14 in 2009 and to SK-15 in 2014. Plaintiff's duty station is at the SEC headquarters offices in Washington, D.C.

3. Also serving in Washington, D.C., are two SEC female employees who are Examination Managers, Katherine Monahan and Christine Curley ("comparators") performing substantially equal work as Plaintiff under substantially similar working conditions, both, like Plaintiff, promoted in grade and now at the SK-15 pay level.

4. Somewhat similar to the General Schedule pay system used in other government agencies, where each grade has separate pay steps, the SK-14-15 grades encompasses a range of pay steps or levels.

5. Through a compensation classification process initiated in 2014 as a result of an agreement reached that year between SEC and the union representing its non-management employees, the National Treasury Employees Union, SEC reset or recalibrated the pay of many of its employees to align their pay so they would receive credit for their years of relevant and specialized work experience without regard to their date of hire. The process developed under that agreement was known as the Pay Transition Program, and pay adjustments under the program were implemented starting in approximately June of 2015. The Program applied to all SEC staff.

6. For employees to be considered for the Pay Transition Program, SEC asked that they submit an application stating their interest and supplying a resume that was to include work history, job titles, job duties, start and end dates for jobs, and full or part-time status. SEC established an open period for applications to the Program from approximately September 14, 2014, through October 14, 2014.

7. Both comparators applied for pay transition consideration within the open period.

8. Plaintiff did not apply for pay transition during the open period because of issues of a personal, family-related nature then occupying his attention.

9. In June of 2015, Examination Manager Christine Curley's salary was raised through pay transition from approximately $175,534, to approximately $195,438, and it has since increased to about $236,000.

10. In June of 2015, Examination Manager Katherine Morgan's salary was raised through pay transition from approximately $144,291 to approximately $169,269, and it has since increased to about $212,000.

11. The work of Plaintiff and the two female comparator Examination Managers

is the same or substantially similar, and their work requires equivalent skill, knowledge, ability, and effort. As Examination Managers they are doing the same jobs, managing examinations involving different regulated entities but applying the same procedures to do so.

12. In June of 2015, Plaintiff's salary was approximately $145,608. Had he received raises in salary similar to those of the comparators, following elevation of the comparators' salaries through the pay transition process, Plaintiff would likely now be earning around $216,000 annually. His SEC annual pay is now about $195,000. The annual and cumulative difference between what he has been paid from 2015 through the present is substantially less than the pay of the female comparators. That difference violates the Equal Pay Act.

13. On information and belief, SEC had available to it through its personnel records the information it sought from pay transition applicants: a copy of Plaintiff's resume (submitted when he applied for SEC employment and that listed his private sector experience), and SEC had Plaintiff's work history, job titles; job duties, dates of each job, and his full-time work status in his Official Personnel File and other personnel records: that resume and application used by Plaintiff to apply for his job; his position description(s) and performance appraisals; and standardized personnel forms showing his full-time status. The SEC personnel who reviewed Pay Transition applicants included SEC's personnel director and managers

of the applicants. They would have been familiar with Plaintiff's position, qualifications, performance, and experience, or had ready access to the information.

14. After Plaintiff's family-related issues abated, but after the administrative deadline set by SEC for application for pay transition consideration, in August and September 2016, after he learned of the pay disparities resulting from the Pay Transition Program, Plaintiff requested of the SEC's personnel director, and of other managers, that he be permitted to receive consideration for the transition program. SEC's personnel director declined to do so, instead suggesting to him instead that he consider using an agency grievance process or the federal Equal Employment complaint process. About ten other SEC employees who were impacted by extenuating circumstances were allowed to apply for pay transition in November and December of 2014, after the close of the open season for the program.

15. As the pay disparity between Plaintiff and the female comparators continued, with no sign that SEC would equalize Plaintiff's pay with theirs, the inequity of the circumstances led Plaintiff to initiate the suggested EEO process, resulting in an administrative complaint, efforts at informal adjustment, an investigation, review of the claim by an EEOC administrative judge, and a final, unfavorable, SEC decision on the EEO complaint in 2021.

16. The Equal Pay Act allows an employer to avoid liability if an otherwise-prohibited pay disparity is based on a factor other than sex, which would include a legitimate, nondiscriminatory business reason.

17. SEC lacks an acceptable business reason under the EPA, and the pay disparity is not based on a factor other than sex, because:

a. Failure to apply for a wage increase does not excuse an employer's failure to comply with the Equal Pay Act, a component of the Fair Labor Standards Act;

b. The application process for pay transition was unnecessary. SEC had and has all the information in its personnel records needed to evaluate the proper level of Plaintiff's pay;

c. SEC had no valid basis for creating, or not extending, a deadline for any employee to apply for and obtain the benefits of pay transition;

d. At all times SEC has had adequate financing to equalize Plaintiff's pay with that of the comparator employees; and

e. A pay classification system—here based on a union contract—is not

a valid defense to a pay disparity otherwise in violation of the Equal Pay Act.

18. As a result of these circumstances, since mid-2015 and continuing to the present, in violation of the Equal Pay Act, 29 USC 206(d), Plaintiff has been paid substantially less than female SEC employees who perform and have performed work requiring equal skill, effort, and responsibility, and which is performed under similar working conditions.

III. DEMAND FOR JUDGMENT

19. As relief, Plaintiff demands judgment for damages in excess of $10,000, representing the difference between his pay and that of the comparators for six years prior to this complaint, continuing to the present, and adjustment of his salary to eliminate a future pay disparity, along with interest, costs, and counsel fees.

Respectfully submitted,

/s/ Peter Broida

Peter B. Broida
Suite 203
1840 Wilson Blvd.
Arlington, VA 22201
703-841-1112
703-841-1006 (facsimile)
peterbroida@gmail.com

Attorney for Plaintiff

September 29, 2021.

SERVICE

I certify that on September 29, 2021, a copy of this complaint was filed electronically through the Electronic Case Filing System, and I understand that notice of the filing will be served on counsel for the Defendant through the ECF system.

/s/ Peter Broida

Peter B. Broida
Suite 203
1840 Wilson Blvd.
Arlington, VA 22201
703-841-1112
703-841-1006 (facsimile)
peterbroida@gmail.com